## UNITED STATES v. FRADY

No. 80–1595.   Argued December 8, 1981—Decided April 5, 1982

O'CONNOR, J., delivered the opinion of the Court, in which WHITE, POWELL, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post*, p. 175. BLACKMUN, J., filed an opinion concurring in the judgment, *post*, p. 175. BRENNAN, J., filed a dissenting opinion, *post*, p. 178. BURGER, C. J., and MARSHALL, J., took no part in the consideration or decision of the case.

*Deputy Solicitor General Frey* argued the cause for the United States. With him on the briefs were *Solicitor General Lee, Assistant Attorney General Jensen,* and *John R. Fisher.*

*Daniel M. Schember,* by appointment of the Court, 454 U. S. 809, argued the cause and filed a brief for respondent.

JUSTICE O'CONNOR delivered the opinion of the Court.

Rule 52(b) of the Federal Rules of Criminal Procedure permits a criminal conviction to be overturned on direct appeal for "plain error" in the jury instructions, even if the defend-

ant failed to object to the erroneous instructions before the jury retired, as required by Rule 30. In this case we are asked to decide whether the same standard of review applies on a collateral challenge to a criminal conviction brought under 28 U. S. C. § 2255.

## I

## A

Joseph Frady, the respondent, does not dispute that 19 years ago he and Richard Gordon killed Thomas Bennett in the front room of the victim's house in Washington, D. C. Nonetheless, because the resolution of this case depends on what the jury learned about Frady's crime, we must briefly recount what happened, as told by the witnesses at Frady's trial and summarized by the Court of Appeals. See *Frady* v. *United States*, 121 U. S. App. D. C. 78, 348 F. 2d 84 (en banc) *(Frady I)*, cert. denied, 382 U. S. 909 (1965).

The events leading up to the killing began at about 4:30 p. m. on March 13, 1963, when two women saw Frady drive slowly by Bennett's house in an old car. Later, at about 7:00 p. m., Frady, accompanied by Richard Gordon and Gordon's friend, Elizabeth Ryder, returned to the same block. On this second trip, Ryder overheard Frady say "something about that is the house over there," at which point Frady and Gordon looked in the direction of the victim's house.

After reconnoitering Bennett's home, Frady, Gordon, and Ryder drove across town to a restaurant, where they were joined by George Bennett, Thomas Bennett's brother. At the restaurant Ryder heard George Bennett tell Frady that "he needed time to get the furniture and things settled." She also heard Frady ask Bennett "if he hit a man in the chest, could you break a rib and fracture or puncture a lung, could it kill a person?" Bennett answered that "[y]ou have to hit a man pretty hard." Just before they left the restaurant, Ryder heard George Bennett say: "If you do a good job you will get a bonus."

Ryder, Gordon, and Frady then set out by car for 11th Place, around the corner from Thomas Bennett's home, where they parked, leaving the motor running. Gordon and Frady told Ryder they were going "just around the corner." As Gordon got out, Ryder saw him reach down and pick up something. She could not see exactly what it was, but it "looked like a cuff of a glove or heavy material of some kind."

A little after 8:30 p. m., a neighbor heard knocking at the front door of Bennett's house, followed by the noise of a fight in progress. At 8:44 p. m., she called the police. Within a couple of minutes, two policemen in a patrol wagon arrived, and one of them got out in time to see Frady and Gordon emerge from Bennett's front door.

Inside Bennett's house, police officers later found a shambles of broken, disordered furniture and blood-spattered walls. Thomas Bennett lay dead in a pool of blood. His neck and chest had suffered horseshoe-shaped wounds from the metal heel plates on Frady's leather boots and his head was caved in by blows from a broken piece of a tabletop, which, significantly, bore no fingerprints. One of Bennett's eyes had been knocked from its socket.

Outside, the policeman on foot heard Frady and Gordon exclaim, "The cops!" as they emerged from the house. They immediately took flight, running around the corner toward their waiting automobile. Both officers pursued, one on foot, the other in the police wagon. As Frady and Gordon ran, one of them threw Thomas Bennett's wallet and a pair of gloves under a parked car. Frady and Gordon managed to reach their waiting automobile and scramble into it without being captured by the officer following on foot, but the patrol wagon arrived in time to block their departure. One of them was then heard to remark, "They've got us." When arrested, Frady and Gordon were covered with their victim's blood. Unlike their victim, however, neither had sustained an injury, apart from a cut on Gordon's forehead.

## B

Although Frady now admits that the evidence that he and Gordon caused Bennett's death was "overwhelming,"[1] at his trial in the United States District Court for the District of Columbia Frady defended solely by denying all responsibility for the killing, suggesting through his attorney that another man, the real murderer, had been seen leaving the victim's house while the police were preoccupied apprehending Frady and Gordon. Consistent with this theory, Frady did not raise any justification, excuse, or mitigating circumstance. A jury convicted Frady of first-degree murder and robbery, and sentenced him to death by electrocution.

Sitting en banc, the Court of Appeals for the District of Columbia Circuit upheld Frady's first-degree murder conviction by a vote of 8–1. *Frady I, supra.* Apparently all nine judges would have affirmed a conviction for second-degree murder.[2]

Nevertheless, by a vote of 5–4, the court set aside Frady's death sentence. The five judges in the majority were unable to agree on a rationale for that result. Four of the five believed the procedures used to instruct and poll the jury on the death penalty were too ambiguous to sustain a sentence of death.[3] The fifth and deciding vote was cast by a judge who

---

[1] Brief for Appellant in No. 79–2356 (CADC), p. 12 *(pro se).*

[2] The sole dissenter, Judge J. Skelly Wright, noted that under the law of the District of Columbia an "intent to inflict serious injury, unaccompanied by premeditation, is sufficient for second degree murder, but first degree murder requires, in addition to premeditation, the specific intent to kill." *Frady I*, 121 U. S. App. D. C., at 91, n. 13, 348 F. 2d, at 97, n. 13 (dissenting in part and concurring in part) (citations omitted). Because Judge Wright believed the evidence sufficient only to sustain a verdict that Frady deliberately intended to injure Thomas Bennett, Judge Wright would have reversed Frady's conviction for first-degree murder. *Id.*, at 91, 348 F. 2d, at 97.

[3] In dissent, THE CHIEF JUSTICE (who was then serving as a Circuit Judge on the Court of Appeals) characterized that view as having "no basis

believed the District Court should have adopted, for the first time in the District of Columbia, a procedure bifurcating the guilt and sentencing phases of Frady's trial. 121 U. S. App. D. C., at 85, 348 F. 2d, at 91 (McGowan, J., concurring). By this narrow margin, Frady escaped electrocution.

Frady was then resentenced to a life term. Almost immediately, he began a long series of collateral attacks on his sentence,[4] culminating in the case now before us.

## C

Frady initiated the present action by filing a motion under 28 U. S. C. § 2255[5] seeking the vacation of his sentence because the jury instructions used at his trial in 1963 were defective. Specifically, Frady argued that the Court of Appeals, in cases decided after his trial and appeal, had disapproved instructions identical to those used in his case. As determined by these later rulings,[6] the judge at Frady's trial

---

without an assumption that these jurors were illiterate morons." *Id.*, at 107, 348 F. 2d, at 113 (concurring in part and dissenting in part).

[4] As summarized by the Court of Appeals, 204 U. S. App. D. C. 234, 236, n. 2, 636 F. 2d 506, 508, n. 2 (1980), Frady filed four motions to vacate or reduce his sentence in 1965, and one each in 1974, 1975, 1976, and 1978. This last motion resulted in a Court of Appeals decision directing that Frady's separate sentences for robbery and murder run concurrently rather than consecutively. *United States* v. *Frady,* 197 U. S. App. D. C. 69, 607 F. 2d 383 (1979) *(Frady II).*

[5] Section 2255 provides in pertinent part:

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence."

[6] Frady cited *Belton* v. *United States,* 127 U. S. App. D. C. 201, 204–205, 382 F. 2d 150, 153–154 (1967); *Green* v. *United States,* 132 U. S. App. D. C.

had improperly equated intent with malice by stating that "a wrongful act . . . intentionally done . . . is therefore done with malice aforethought." See 204 U. S. App. D. C. 234, 236, n. 6, 636 F. 2d 506, 508, n. 6 (1980). Also, the trial judge had incorrectly instructed the jury that "the law infers or presumes from the use of such weapon in the absence of explanatory or mitigating circumstances the existence of the malice essential to culpable homicide." See *id.*, at 236, 636 F. 2d, at 508. In his § 2255 motion Frady contended that these instructions compelled the jury to presume malice and thereby wrongfully eliminated any possibility of a manslaughter verdict, since manslaughter was defined as culpable homicide without malice.[7]

The District Court denied Frady's § 2255 motion, stating that Frady should have challenged the jury instructions on direct appeal, or in one of his many earlier motions. The Court of Appeals reversed. The court held that the proper standard to apply to Frady's claim is the "plain error" standard governing relief on direct appeal from errors not objected

---

98, 99–100, 405 F. 2d 1368, 1369–1370 (1968) *(Green I);* and *United States* v. *Wharton,* 139 U. S. App. D. C. 293, 297–298, 433 F. 2d 451, 455–456 (1970). The Government does not contest Frady's assertion that the jury instructions were erroneous as determined by these later rulings.

[7] See, *e. g., Fryer* v. *United States,* 93 U. S. App. D. C. 34, 38, 207 F. 2d 134, 138 (manslaughter is "the unlawful killing of a human being without malice") (emphasis deleted), cert. denied, 346 U. S. 885 (1953); *United States* v. *Wharton, supra,* at 296, 433 F. 2d, at 454 (malice is "the sole element differentiating murder from manslaughter").

Frady also challenged the trial judge's instruction that "[a] person is presumed to intend the natural [and] probable consequences of his act." See 204 U. S. App. D. C., at 237, n. 7, 636 F. 2d, at 509, n. 7. Frady argued that this instruction was unconstitutional under our decision in *Sandstrom* v. *Montana,* 442 U. S. 510 (1979), in which we held that a similar instruction that "[t]he law presumes that a person intends the ordinary consequences of his voluntary acts" might impermissibly lead a reasonable juror to believe the presumption is conclusive. The Court of Appeals refrained from deciding this issue, however, so we do not consider it here.

to at trial, Fed. Rule Crim. Proc. 52(b), rather than the "cause and actual prejudice" standard enunciated in *Wainwright* v. *Sykes*, 433 U. S. 72 (1977), *Francis* v. *Henderson*, 425 U. S. 536 (1976), and *Davis* v. *United States*, 411 U. S. 233 (1973), governing relief on collateral attack following procedural default at trial. Finding the challenged instructions to be plainly erroneous, the court vacated Frady's sentence and remanded the case for a new trial or, more realistically, the entry of a judgment of manslaughter. Over a vigorous dissent, the full Court of Appeals denied the Government a rehearing en banc.

We granted the Government's petition for a writ of certiorari to review whether the Court of Appeals properly invoked the "plain error" standard in considering Frady's belated collateral attack. 453 U. S. 911 (1981).

## II

Before we reach the merits, however, we first must consider an objection Frady makes to our grant of certiorari. Frady argues that we should refrain from reviewing the decision below because the issues presented pertain solely to the local law of the District of Columbia, with which we normally do not interfere.[8]

Frady's contention is that the federal courts in the District of Columbia exercise a purely local jurisdictional function when they rule on a § 2255 motion brought by a prisoner convicted of a local law offense. Thus, according to Frady, the general federal law controlling the disposition of § 2255 motions does not apply to his case. Instead, a special local brand of § 2255 law, developed to implement that section for

---

[8] As we said in *Fisher* v. *United States*, 328 U. S. 463, 476 (1946): "Matters relating to law enforcement in the District [of Columbia] are entrusted to the courts of the District. Our policy is not to interfere with the local rules of law which they fashion, save in exceptional situations where egregious error has been committed."

the benefit of local offenders in the District of Columbia, controls. Frady concludes that we should therefore refrain from disturbing the ruling below, since it is based on an adequate and independent local ground of decision.[9]

To examine Frady's contention, it is necessary to review some history. When Frady was tried in 1963, the United States District Court for the District of Columbia had exclusive jurisdiction over local felonies, and the United States Court of Appeals for the District of Columbia Circuit acted as the local appellate court, issuing binding decisions of purely local law. In 1970, however, the District of Columbia Court Reform and Criminal Procedure Act (Court Reform Act), 84 Stat. 473, split the local District of Columbia and federal criminal jurisdictions, directing local criminal cases to a newly created local court system and retaining (with minor exceptions) only federal criminal cases in the existing Federal District Court and Court of Appeals.

As part of this division of jurisdiction, the Court Reform Act substituted for § 2255 a new local statute controlling collateral relief for those convicted in the new local trial court. See D. C. Code § 23–110 (1981). The Act, however, did not alter the jurisdiction of the federal courts in the District to hear postconviction motions and appeals brought under § 2255, either by prisoners like Frady who were convicted of local offenses prior to the Act, or by prisoners convicted in federal court after the Act.

The crux of Frady's argument is that the equal protection component of the Due Process Clause of the Fifth Amendment would be violated unless the Court Reform Act is interpreted as implicitly and retroactively splitting, not just the District's court system, but also the District's law governing § 2255 motions. According to Frady, equal protection principles require that a § 2255 motion brought by a prisoner con-

---

[9] Frady, of course, does not argue that we do not have jurisdiction under 28 U. S. C. § 1254(1) to hear this case, only that we should, in our discretion, refrain from exercising it.

victed of a local crime in Federal District Court prior to the passage of the Court Reform Act be treated identically to a motion under local D. C. Code § 23–110 brought by a prisoner convicted in the local Superior Court after the passage of the Act. Frady suggests that the Court of Appeals for this reason must have ruled on his motion as though it were subject to the local law developed pursuant to § 23–110, and that we should not intervene in this local dispute.

Frady's argument, however, was neither made to the court below nor followed by it. Nowhere in the Court of Appeals' opinion—or in the submissions to that court or to the District Court[10]—is there any hint that there may be peculiarities of § 2255 law unique to collateral attack in the District of Columbia. To the contrary, the analysis and authorities cited by the Court of Appeals make it clear that the court relied on the general federal law controlling all § 2255 motions, and did not intend to afford Frady's § 2255 motion special treatment simply because Frady was convicted under the District of Columbia Code rather than under the United States Code.

Moreover, the Court of Appeals would have erred had it done so. There is no reason to believe that Congress intended the result Frady suggests, and he does not attempt the impossible task of showing that it did. Furthermore, Frady's suggestions to the contrary notwithstanding, equal protection principles do not require that a motion filed pursuant to § 2255 by a prisoner convicted in the Federal District Court in 1963 be treated as though it had been filed pursuant to D. C. Code § 23–110 after 1970. In fact, even those tried in federal court contemporaneously with those tried for the same offense in the local court need not always be treated identically. As we noted in *Swain* v. *Pressley*, 430 U. S. 372, 379–380, n. 12 (1977), for example, persons

---

[10] We note that Frady's winning *pro se* brief to the court below, though extensively discussing the general federal law regarding the proper disposition of § 2255 motions, nowhere suggested that special local rules should be applied to the case.

convicted in the local courts are not denied equal protection of the laws simply because they, unlike persons convicted in the federal courts, must bring collateral challenges to their convictions before Art. I judges.[11]

In short, we find no basis whatever for concluding that the ruling below was or should have been grounded on local District of Columbia law, rather than the general federal law applied to all § 2255 motions.[12]   Therefore, we proceed to the merits.

## III

### A

Nineteen years after his crime, Frady now complains he was convicted by a jury erroneously instructed on the meaning of malice.   At trial, however, Frady did not object to the instructions, nor did he raise the issue on direct appeal. Rule 30 of the Federal Rules of Criminal Procedure declares in pertinent part:

> "No party may assign as error any portion of the charge or omission therefrom unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection."

---

[11] The Court of Appeals for the District of Columbia Circuit has reached the same conclusion on an analogous issue.   See *United States* v. *Brown*, 157 U. S. App. D. C. 311, 483 F. 2d 1314 (1973) (federal, not local, bail law applies to an appellant convicted of a local offense in federal court, despite the fact that the harsher local law applies to those convicted of the same offense in the local courts).

[12] We mention in passing that it is unclear that Frady would face law more favorable to his cause were his § 2255 motion treated as though it were a local § 23–110 motion.   The highest local court, the District of Columbia Court of Appeals, has written that "[o]ur rule, D. C. Code 1973, § 23–110, is nearly identical and functionally equivalent to § 2255, and we may therefore rely on cases construing the federal rule." *Butler* v. *United States*, 388 A. 2d 883, 886, n. 5 (1978).   We express no view on the similarities between § 23–110 and § 2255, however.   As Frady has reminded us:

Rule 52(b), however, somewhat tempers the severity of Rule 30. It grants the courts of appeals the latitude to correct particularly egregious errors on appeal regardless of a defendant's trial default:

> "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

Rule 52(b) was intended to afford a means for the prompt redress of miscarriages of justice.[13] By its terms, recourse may be had to the Rule only on appeal from a trial infected with error so "plain" the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it. The Rule thus reflects a careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed.[14]

---

"The administration of criminal law in matters not affected by constitutional limitations or a general federal law is a matter peculiarly of local concern." *Fisher* v. *United States*, 328 U. S., at 476.

[13] The Rule merely restated existing law. See Advisory Committee's Notes on Fed. Rule Crim. Proc. 52(b), 18 U. S. C. App., p. 1478, citing *Wiborg* v. *United States*, 163 U. S. 632, 658 (1896) ("although this question was not properly raised, yet if a plain error was committed in a matter so absolutely vital to defendants, we feel ourselves at liberty to correct it"). See also *United States* v. *Atkinson*, 297 U. S. 157, 160 (1936) ("In exceptional circumstances, especially in criminal cases, appellate courts, in the public interest, may, of their own motion, notice errors to which no exception has been taken, if the errors are obvious, or if they otherwise seriously affect the fairness, integrity or public reputation of judicial proceedings").

[14] The Courts of Appeals long have recognized that the power granted them by Rule 52(b) is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result. See, *e. g.*, *United States* v. *Gerald*, 624 F. 2d 1291, 1299 (CA5 1980) ("Plain error is error which is 'both obvious and substantial'. . . . The plain error rule is not a run-of-the-mill remedy. The intention of the rule is to serve the ends of justice; therefore it is invoked 'only in exceptional circumstances [where necessary] to avoid a miscarriage of justice'" (citations omitted)), cert. denied, 450 U. S. 920 (1981); *United States* v. *DiBenedetto*, 542 F. 2d 490, 494

Because it was intended for use on direct appeal, however, the "plain error" standard is out of place when a prisoner launches a collateral attack against a criminal conviction after society's legitimate interest in the finality of the judgment has been perfected by the expiration of the time allowed for direct review or by the affirmance of the conviction on appeal. Nevertheless, in 1980 the Court of Appeals applied the "plain error" standard to Frady's long-delayed § 2255 motion, as though the clock had been turned back to 1965 when Frady's case was first before the court on direct appeal. In effect, the court allowed Frady to take a second appeal 15 years after the first was decided.

As its justification for this action, the Court of Appeals pointed to a single phrase to be found in our opinion in *Davis* v. *United States*, 411 U. S., at 240–241. There we asserted that "no more lenient standard of waiver should apply" on collateral attack than on direct review. Seizing on this phrase, the Court of Appeals interpreted "no more lenient" as meaning, in effect, no more stringent, and for this reason applied the "plain error" standard for direct review to Frady's collateral challenge, despite long-established contrary authority.

By adopting the same standard of review for § 2255 motions as would be applied on direct appeal, the Court of Appeals accorded no significance whatever to the existence of a final judgment perfected by appeal. Once the defendant's chance to appeal has been waived or exhausted, however, we are entitled to presume he stands fairly and finally convicted, especially when, as here, he already has had a fair opportunity to present his federal claims to a federal forum. Our trial and appellate procedures are not so unreliable that we may not afford their completed operation any binding effect

(CA8 1976) ("This court, along with courts in general, have applied the plain error rule sparingly and only in situations where it is necessary to do so to prevent a great miscarriage of justice" (citations omitted)).

beyond the next in a series of endless postconviction collateral attacks. To the contrary, a final judgment commands respect.

For this reason, we have long and consistently affirmed that a collateral challenge may not do service for an appeal. See, *e. g., United States* v. *Addonizio,* 442 U. S. 178, 184–185 (1979); *Hill* v. *United States,* 368 U. S. 424, 428–429 (1962); *Sunal* v. *Large,* 332 U. S. 174, 181–182 (1947); *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 274 (1942); *Glasgow* v. *Moyer,* 225 U. S. 420, 428 (1912); *In re Gregory,* 219 U. S. 210, 213 (1911). As we recently had occasion to explain:

> "When Congress enacted §2255 in 1948, it simplified the procedure for making a collateral attack on a final judgment entered in a federal criminal case, but it did not purport to modify the basic distinction between direct review and collateral review. It has, of course, long been settled law that an error that may justify reversal on direct appeal will not necessarily support a collateral attack on a final judgment. The reasons for narrowly limiting the grounds for collateral attack on final judgments are well known and basic to our adversary system of justice." *United States* v. *Addonizio, supra,* at 184 (footnotes omitted).

This citation indicates that the Court of Appeals erred in reviewing Frady's §2255 motion under the same standard as would be used on direct appeal, as though collateral attack and direct review were interchangeable.

Moreover, only five years ago we expressly stated that the plain-error standard is inappropriate for the review of a state prisoner's collateral attack on erroneous jury instructions:

> "Orderly procedure requires that the respective adversaries' views as to how the jury should be instructed be presented to the trial judge in time to enable him to de-

liver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

> "The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal." Henderson v. Kibbe, 431 U. S. 145, 154 (1977) (emphasis added) (footnotes omitted).

Seemingly, we could not have made the point with greater clarity. Of course, unlike in the case before us, in Kibbe the final judgment of a state, not a federal, court was under attack, so considerations of comity were at issue that do not constrain us here. But the Federal Government, no less than the States, has an interest in the finality of its criminal judgments. In addition, a federal prisoner like Frady, unlike his state counterparts, has already had an opportunity to present his federal claims in federal trial and appellate forums. On balance, we see no basis for affording federal prisoners a preferred status when they seek postconviction relief.

In sum, the lower court's use of the "plain error" standard to review Frady's § 2255 motion was contrary to long-established law from which we find no reason to depart. We reaffirm the well-settled principle that to obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.[15]

---

[15] In the present case we address only the proper standard to be used by a district court engaged pursuant to § 2255 in the collateral review of the original criminal trial. We of course do not hold that the "plain error" standard cannot be applied by a court of appeals on direct review of a district court's conduct of the § 2255 hearing itself.

JUSTICE BRENNAN in his dissenting opinion, post, at 182–183, and JUSTICE BLACKMUN in his opinion concurring in the judgment, post, at 176,

## B

We believe the proper standard for review of Frady's motion is the "cause and actual prejudice" standard enunciated in *Davis* v. *United States,* 411 U. S. 233 (1973), and later confirmed and extended in *Francis* v. *Henderson,* 425 U. S. 536 (1976), and *Wainwright* v. *Sykes,* 433 U. S. 72 (1977). Under this standard, to obtain collateral relief based on trial

---

and n., point out that § 2255 Rule 12 directs that "[i]f no procedure is specifically prescribed by these rules, the district court may proceed in any lawful manner not inconsistent with these rules, or any applicable statute, and may apply the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure, whichever it deems more appropriate, to motions filed under these rules." JUSTICES BRENNAN and BLACKMUN contend that the procedural directive of § 2255 Rule 12 indicates that the "plain error" standard of Rule 52(b) of the Federal Rules of Criminal Procedure applies to the district court's collateral review of the original trial. They do not point to any evidence that § 2255 Rule 12 was intended to have such a surprising effect, however.

By approving § 2255 Rule 12, we believe Congress intended merely to authorize a court in its discretion to use the Federal Rules of Criminal Procedure to regulate the conduct of a § 2255 proceeding. A court of appeals, for example, could invoke the "plain error" standard on direct review of a district court's conduct of a § 2255 hearing, if the court of appeals found a sufficiently egregious error in the § 2255 proceeding itself that had not been brought to the attention of the district court. Thus, as § 2255 Rule 12 suggests, under proper circumstances Rule 52(b) can play a role in § 2255 proceedings.

We also note that, contrary to the suggestions in the dissenting opinion, § 2255 Rule 12 does not mandate by its own force the use of any particular Rule of Civil or Criminal Procedure. The Advisory Committee's Note to § 2255 Rule 12, 28 U. S. C., p. 287, refers the reader "[f]or discussion" of possible restrictions on the use of the Rules of Procedure to the Note to the analogous provision governing proceedings under 28 U. S. C. § 2254, § 2254 Rule 11 (which provides: "The Federal Rules of Civil Procedure, to the extent that they are not inconsistent with these rules, may be applied, when appropriate, to petitions filed under these rules"). The Advisory Committee's Note to § 2254 Rule 11, 28 U. S. C., p. 275, explains that the Rule "allow[s] the court considering the petition to use any of the rules of civil procedure (unless inconsistent with these rules of habeas corpus) when in its discretion the court decides they are appropriate under the circumstances of the particular case. The court does not have to rigidly ap-

errors to which no contemporaneous objection was made, a convicted defendant must show both (1) "cause" excusing his double procedural default, and (2) "actual prejudice" resulting from the errors of which he complains. In applying this dual standard to the case before us, we find it unnecessary to determine whether Frady has shown cause, because we are confident he suffered no actual prejudice of a degree sufficient to justify collateral relief 19 years after his crime.[16]

In considering the prejudice, if any, occasioned by the erroneous jury instructions used at Frady's trial, we note that in *Wainwright* v. *Sykes* we refrained from giving "precise content" to the term "prejudice," expressly leaving to future cases further elaboration of the significance of that term. *Id.*, at 91. While the import of the term in other situations thus remains an open question, our past decisions nevertheless eliminate any doubt about its meaning for a defendant who has failed to object to jury instructions at trial.

---

ply rules which would be inconsistent or inequitable in the overall framework of habeas corpus." As we have explained in the text above, use of the "plain error" standard is "inconsistent or inequitable in the overall framework" of collateral review of federal criminal convictions under § 2255.

[16] Frady claims that he had "cause" not to object at trial or on appeal because those proceedings occurred before the decisions of the Court of Appeals disapproving the erroneous instructions. Any objection, he asserts, therefore would have been futile.

In this regard, the Government points out that the first case to reject the jury instructions Frady now attacks was decided only two years after Frady's appeal was decided. *Belton* v. *United States*, 127 U. S. App. D. C. 201, 382 F. 2d 150 (1967). The *Belton* court seemed to consider the law as clearcut, and attributed the erroneous instruction to inadvertence by the trial judge, stating: "We have little doubt that if objection had been made this slip of the tongue by a capable trial judge—assuming the reporter heard him right—would have been corrected." *Id.*, at 205, 382 F. 2d, at 154. Likewise, in *Green I*, the court asserted that the trial court had given the erroneous instruction "no doubt inadvertently." 132 U. S. App. D. C., at 100, 405 F. 2d, at 1370. In light of these decisions, the Government argues here that "[i]t is difficult to believe that it would have

Recently, for example, JUSTICE STEVENS, in his opinion without dissent in *Henderson* v. *Kibbe,* summarized the degree of prejudice we have required a prisoner to show before obtaining collateral relief for errors in the jury charge as "'whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process,' not merely whether 'the instruction is undesirable, erroneous, or even universally condemned.'" 431 U. S., at 154 (quoting *Cupp* v. *Naughten,* 414 U. S. 141, 147, 146 (1973)).[17] We reaffirm this formulation, which requires that the degree of prejudice resulting from instruction error be evaluated in the total context of the events at trial. As we have often emphasized: "[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge." *Cupp* v. *Naughten, supra,* at 146–147 (citations omitted). Moreover, "a judgment of conviction is commonly the culmination of a trial which includes testimony of witnesses, argument of counsel, receipt of exhibits in evidence, and instruction of the jury by the judge. Thus not only is the challenged instruction but one of many such instructions, but the process of instruction itself is but one of several components of the trial which may result in the judgment of conviction." *Id.,* at 147.

We now apply these established standards to Frady's case.

## IV

Frady bases his claim that he was prejudiced on his assertion that the jury was not given an adequate opportunity to

---

been futile in 1965 for respondent to present his current objections to the jury instructions to the court of appeals that decided *Belton* in 1967 and *Green I* in 1968." Brief for United States 33. See *Engle* v. *Isaac, ante,* p. 107, in which we addressed a similar argument.

[17] *Kibbe* involved a habeas petition brought by a state, not a federal, convict. As we noted *supra,* at 166, however, the federal interest in finality is as great as the States', and the relevant federal constitutional strictures apply with equal force to both jurisdictions.

consider a manslaughter verdict. According to Frady, the trial court's erroneous instructions relieved the Government of the burden of proving malice, an element of the crime of murder, beyond a reasonable doubt, so that, as Frady would have it, his conviction must be overturned.[18]

So stated, Frady's claim of actual prejudice has validity only if an error in the instructions concerning an element of the crime charged amounts to prejudice *per se*, regardless of the particular circumstances of the individual case. Our precedents, however, hold otherwise. Contrary to Frady's suggestion, he must shoulder the burden of showing, not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.

---

[18] At the time Frady was tried, murder in the first degree was defined (and still is) as a killing committed "purposely" "of deliberate and premeditated malice." D. C. Code § 22–2401 (1981). Murder in the second degree was defined as a killing (other than a first-degree murder) with "malice aforethought." § 22–2403. Culpable killings without malice were defined to be manslaughter. See n. 7, *supra*.

The District of Columbia statutes defining murder in the first and second degree were first passed at the turn of the century, Act of Mar. 3, 1901, 31 Stat. 1321, ch. 854, §§ 798, 800, as a codification of the common-law definitions, which they did not displace. See *O'Connor* v. *United States*, 399 A. 2d 21 (D. C. 1979); *Hamilton* v. *United States*, 26 App. D. C. 382, 385 (1905). The definition of manslaughter was never codified, but remains a matter of common law. See *United States* v. *Pender*, 309 A. 2d 492 (D. C. 1973).

The significance of the various degrees of homicide under the law of the District was summarized by the Court of Appeals in 1967:

"In homespun terminology, intentional murder is in the first degree if committed in cold blood, and is murder in the second degree if committed on impulse or in the sudden heat of passion. . . . [A] homicide conceived in passion constitutes murder in the first degree only if the jury is convinced beyond a reasonable doubt that there was an appreciable time after the design was conceived and that in this interval there was a further thought, and a turning over in the mind—and not a mere persistence of the initial impulse of passion.

". . . An unlawful killing in the sudden heat of passion—whether pro-

This Frady has failed to do. At the outset, we emphasize that this would be a different case had Frady brought before the District Court affirmative evidence indicating that he had been convicted wrongly of a crime of which he was innocent. But Frady, it must be remembered, did not assert at trial that he and Richard Gordon beat Thomas Bennett to death without malice. Instead, Frady claimed he had nothing whatever to do with the crime. The evidence, however, was overwhelming, and Frady promptly abandoned that theory on appeal. *Frady I*, 121 U. S. App. D. C., at 95, 348 F. 2d, at 101. Since that time, Frady has never presented colorable evidence, even from his own testimony, indicating such justification, mitigation, or excuse that would reduce his crime from murder to manslaughter.

Indeed, the evidence in the record compels the conclusion that there was, as the dissenters from the denial of a rehearing en banc below put it, "malice aplenty." 204 U. S. App. D. C., at 245, 636 F. 2d, at 517. Frady and Gordon twice reconnoitered their victim's house on the afternoon and evening of the murder. Just before the killing, they were overheard in a conversation suggesting that they "were assassins

---

duced by rage, resentment, anger, terror or fear—is reduced from murder to manslaughter only if there was adequate provocation, such as might naturally induce a reasonable man in the passion of the moment to lose self-control and commit the act on impulse and without reflection." *Austin* v. *United States*, 127 U. S. App. D. C. 180, 188, 382 F. 2d 129, 137 (citations omitted).

The policy basis for the distinction between first-degree murder and other homicides was explained in *Bullock* v. *United States*, 74 App. D. C. 220, 221, 122 F. 2d 213, 214 (1941):

"Statutes like ours, which distinguish deliberate and premeditated murder from other murder, reflect a belief that one who meditates an intent to kill and then deliberately executes it is more dangerous, more culpable or less capable of reformation than one who kills on sudden impulse; or that the prospect of the death penalty is more likely to deter men from deliberate than from impulsive murder. The deliberate killer is guilty of first degree murder; the impulsive killer is not."

hired by George Bennett to .do away with his brother." *Frady I, supra*, at 97, 348 F. 2d, at 103 (Miller, J., concurring in part and dissenting in part). They brought gloves to the scene of the murder which they discarded during their flight from the police, and the murder weapon bore no fingerprints. Finally, there was the unspeakable brutality of the killing itself.

Indeed, the evidence of malice was strong enough that the 10 judges closest to the case—the trial judge and the 9 judges who 17 years ago decided Frady's appeal en banc—were at that time *unanimous* in finding the record at least sufficient to sustain a conviction for second-degree murder—a killing with malice. Nine of the ten judges went further, finding the evidence sufficient to sustain the jury's verdict that Frady not only killed with malice, but with premeditated and deliberate intent.

We conclude that the strong uncontradicted evidence of malice in the record, coupled with Frady's utter failure to come forward with a colorable claim that he acted without malice, disposes of his contention that he suffered such actual prejudice that reversal of his conviction 19 years later could be justified. We perceive no risk of a fundamental miscarriage of justice in this case.

Should any doubt remain, our examination of the jury instructions shows no substantial likelihood that the same jury that found Frady guilty of first-degree murder would have concluded, if only the malice instructions had been better framed, that his crime was only manslaughter. The jury, after all, did not merely find Frady guilty of second-degree murder, which requires only malice. It found Frady guilty of first-degree—deliberate and premeditated—murder.

To see precisely what the jury had to conclude to make this finding, it is necessary to examine the instructions the trial judge gave the jury on the meaning of premeditation and deliberation:

"[P]remeditation is the formation of the intent or plan to kill, the formation of a positive design to kill. It must have been considered by the defendants.

"It is your duty to determine from the facts and circumstances in this case as you find them surrounding the killing whether reflection and consideration amounting to deliberation occurred. If so, even though it be of exceedingly brief duration, that is sufficient, because it is the fact of deliberation rather than the length of time it continued that is important. Although some appreciable period of time must have elapsed during which the defendants deliberated in order for this element to be established, no particular length of time is necessary for deliberation; and it does not require the lapse of days or hours or even of minutes." Tr. in No. 402–63 (DC), p. 806, reprinted at App. 28.

By contrast, to have found Frady guilty of manslaughter the jury would have had to find the presence of the kind of excuse, justification, or mitigation that reduces a killing from murder to manslaughter. As the trial court put it:

"The element [sic] the Government must prove in order for you to find the defendants guilty of manslaughter are:

"One, that the defendants inflicted a wound or wounds from which the deceased died, these being inflicted in the District of Columbia.

"Two, that the defendants struck the deceased in sudden passion, without malice, that the defendants' sudden passion was aroused by adequate provocation. When I say sudden passion, I mean to include rage, resentment, anger, terror and fear; so when I use the expression 'sudden passion.' [sic] I include all of these.

"Provacation, [sic] in order to bring a homicide under the offense of manslaughter, must be adequate, must be such as might naturally induce a reasonable man in anger

of the moment to commit the deed. It must be such provocation would *[sic]* have like effect upon the mind of a reasonable or average man causing him to lose his self-control.

"In addition to the great provocation, there must be passion and hot blood caused by that provocation. Mere words, however, no matter how insulting, offensive or abusive, are not adequate to induce *[sic]* a homicide although committed in passion, provoked, as I have explained, from murder to manslaughter." *Id.*, at 809, reprinted at App. 30.

Plainly, a rational jury that believed Frady had formed a "plan to kill . . . a positive design to kill" with "reflection and consideration amounting to deliberation," could not also have believed that he acted in "sudden passion . . . aroused by adequate provocation . . . causing him to lose his self-control." We conclude that, whatever it may wrongly have believed malice to be, Frady's jury would not have found passion and provocation, especially since Frady presented no evidence whatever of mitigating circumstances, but instead defended by disclaiming any involvement with the killing.[19] Surely there is no substantial likelihood the erroneous malice instructions prejudiced Frady's chances with the jury.

---

[19] Nor, on the facts of this case, would a finding of a premeditated and deliberate intent to kill be consistent as a matter of law with an absence of malice. See n. 18, *supra*.

We are not alone in finding that an erroneous malice instruction is not necessarily cause for reversal. Even on direct appeal rather than on collateral attack, the highest court in the District of Columbia has refused to reverse convictions obtained after the use of precisely the same instructions of which Frady complains here. For example, in *Belton* v. *United States*, 127 U. S. App. D. C. 201, 382 F. 2d 150 (1967), the first decision expressly to disapprove the instruction that the law infers malice from the use of a deadly weapon, the court affirmed a first-degree murder conviction with the observation that a "jury inferring premeditation and deliberation could hardly have failed to infer malice." *Id.*, at 206, 382 F. 2d, at 155. Similarly, in *Howard* v. *United States*, 128 U. S. App. D. C. 336, 389 F. 2d 287 (1967), a second-degree murder conviction was affirmed on direct ap-

## V

In sum, Frady has fallen far short of meeting his burden of showing that he has suffered the degree of actual prejudice necessary to overcome society's justified interests in the finality of criminal judgments. Therefore, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*So ordered.*

THE CHIEF JUSTICE and JUSTICE MARSHALL took no part in the consideration or decision of this case.

JUSTICE STEVENS, concurring.

Although my view of the relevance of the cause for counsel's failure to object to a jury instruction is significantly different from the Court's, see *Wainwright* v. *Sykes*, 433 U. S. 72, 94–97 (STEVENS, J., concurring); *Rose* v. *Lundy*, 455 U. S. 509, 538 (STEVENS, J., dissenting); *Engle* v. *Isaac*, *ante*, at 136–137, n. 1 (STEVENS, J., concurring in part and dissenting in part), I have joined the Court's opinion in this case because it properly focuses on the character of the prejudice to determine whether collateral relief is appropriate.

JUSTICE BLACKMUN, concurring in the judgment.

Like JUSTICE BRENNAN, I believe that the plain-error rule of Federal Rule of Criminal Procedure 52(b) has some applicability in a § 2255 proceeding. In my view, recognizing a federal court's discretion to redress plain error on collateral review neither nullifies the cause-and-prejudice requirement articulated in *Wainwright* v. *Sykes*, 433 U. S. 72 (1977), nor disserves the policies underlying that requirement.

---

peal, although the same defective instruction had been given. In two cases in which the defendants put malice in issue by raising self-defense claims at trial, however, the court, on direct appeal, reversed murder convictions obtained through the use of the faulty instructions. *Green I*, 132 U. S. App. D. C. 98, 405 F. 2d 1368 (1968); *United States* v. *Wharton*, 139 U. S. App. D. C. 293, 433 F. 2d 451 (1970).

Despite the Court's assertions that Rule 52(b) was intended for use only on direct appeal and that the Court of Appeals ignored "long-established contrary authority," *ante*, at 164, I find nothing in the Rule's seemingly broad language supporting the Court's restriction of its scope. In fact, the plain-error doctrine is specifically made applicable to all stages of all criminal proceedings, which, as the dissenting opinion points out, include the collateral review procedures of § 2255. See *post*, at 179–180, 182, and nn. 5, 6. Even more striking, § 2255 Rule 12 explicitly permits a federal court to "apply the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure, whichever it deems most appropriate, to motions filed under these rules."*

The cause-and-prejudice standard of *Wainwright* v. *Sykes*, *supra*, is premised on the notion that contemporaneous-objection rules are entitled to respect—in the interests of preserving comity and effecting the administrative goals such rules are designed to serve. See 433 U. S., at 88–90. As the Court concedes, considerations of comity are not at issue here. See *ante*, at 166. The second objective of the cause-and-prejudice requirement—to enforce contemporaneous-objection rules and, in particular, to ensure finality—is, in

---

*Although § 2255 Rule 12 does not "mandate by its own force the use of any particular Rule of Civil or Criminal Procedure," *ante*, at 167, n. 15, it does afford a federal court discretion in determining whether to apply the Federal Rules of Criminal Procedure or the Federal Rules of Civil Procedure. The Court's extended discussion, in the same footnote, of the Advisory Committee's Note to § 2254 Rule 11, is beside the point. The Advisory Committee's Note to § 2255 Rule 12 expressly observes that Rule 12 "differs" from § 2254 Rule 11 in that the former "includes the Federal Rules of Criminal Procedure as well as the civil." 28 U. S. C., p. 287. And the note to Rule 12 apparently refers to the note accompanying § 2254 Rule 11 "[f]or discussion" only of "the restrictions in Fed. R. Civ. P. 81(a)(2). . . ." Even if the note to § 2254 Rule 11 is relevant to our decision in this case, I do not subscribe to the Court's conclusion that the plain-error doctrine is " 'inconsistent or inequitable in the overall framework' " of collateral review pursuant to § 2255. See *ante*, at 167–168, n. 15, quoting Advisory Committee's Note to § 2254 Rule 11.

my view, similarly irrelevant where, as the Court of Appeals found here, an explicit exception to the contemporaneous-objection rule is applicable. Giving effect to an express exception to a contemporaneous-objection rule is hardly inconsistent with that rule. Where a jurisdiction has established an exception to its contemporaneous-objection requirement and a prisoner's petition for collateral review falls within that exception, I see no need for the prisoner to prove "cause" for his failure to comply with a rule that is inapplicable in his case.

In the federal courts, the plain-error doctrine constitutes an exception to Federal Rule of Criminal Procedure 30's requirement that defendants make timely objections to instructions. If the Court of Appeals properly characterized the errors identified by respondent as plain error, it correctly refused to require him to make the cause-and-prejudice showing described in *Wainwright* v. *Sykes, supra.*

This approach does not, as the Court charges, "affor[d] federal prisoners a preferred status when they seek post-conviction relief." *Ante,* at 166. The Court has long recognized that the *Wainwright* v. *Sykes* standard need not be met where a State has declined to enforce its own contemporaneous-objection rule. See, *e. g., Ulster County Court* v. *Allen,* 442 U. S. 140, 148–154 (1979); *Wainwright* v. *Sykes,* 433 U. S., at 87; *Francis* v. *Henderson,* 425 U. S. 536, 542, n. 5 (1976). Similarly, the cause-and-prejudice standard should not be a barrier to relief when the plain-error exception to the federal contemporaneous-objection requirement is applicable. The federal contemporaneous-objection rules may differ from those of the States, and the applicability of the *Wainwright* v. *Sykes* standard therefore may vary according to the contours of the particular jurisdiction's contemporaneous-objection requirement. But that variance does not improperly distinguish between federal and state prisoners, just as respecting any differences between the contemporaneous-objection rules of two States creates no impermissible

distinction. In fact, it is the Court's approach—refusing to give effect to the plain-error exception to the federal contemporaneous-objection rule, while recognizing exceptions to the analogous state rules—that gives some prisoners a "preferred status."

Similarly, my approach does not afford prisoners "a second appeal," *ante*, at 164, thus sacrificing the interest in finality of convictions. As the dissenting opinion observes, acknowledging the applicability of Rule 52(b) in § 2255 proceedings does not merge direct appeal and collateral review. See *post*, at 180–181, n. 2; see also *United States* v. *Addonizio*, 442 U. S. 178, 186 (1979); *Henderson* v. *Kibbe*, 431 U. S. 145, 154 (1977).

Because I agree with the Court, however, that respondent has not demonstrated that the erroneous jury instructions of which he complains "so infected the entire trial that the resulting conviction violates due process," *Cupp* v. *Naughten*, 414 U. S. 141, 147 (1973), I conclude that the Court of Appeals erred in holding that respondent was entitled to relief under Rule 52(b). Accordingly, I concur in the reversal of the judgment of the Court of Appeals.

JUSTICE BRENNAN, dissenting.

I have frequently dissented from this Court's progressive emasculation of collateral review of criminal convictions. *E. g., Engle* v. *Isaac, ante*, p. 107; *Sumner* v. *Mata*, 449 U. S. 539, 552 (1981); *Wainwright* v. *Sykes*, 433 U. S. 72, 99 (1977); *Stone* v. *Powell*, 428 U. S. 465, 502 (1976); see also *Davis* v. *United States*, 411 U. S. 233, 245 (1973) (MARSHALL, J., dissenting). Today the Court takes a further step down this unfortunate path by declaring the plain-error standard of the Federal Rules of Criminal Procedure inapplicable to petitions for relief under 28 U. S. C. § 2255. In so doing, the Court does not pause to consider the nature of the plain-error Rule. Nor does the Court consider the *criminal* character of a proceeding under § 2255 as distinguished from

the *civil* character of a proceeding under 28 U. S. C. § 2254. Because the Court's decision is obviously inconsistent with both, I dissent.

## I

## A

The Court declares that the plain-error Rule, Fed. Rule Crim. Proc. 52(b), was intended for use only on direct appeal and is "out of place" when the prisoner is collaterally attacking his conviction. *Ante*, at 164. But the power to notice plain error at any stage of a criminal proceeding is fundamental to the courts' obligation to correct substantial miscarriages of justice. That obligation qualifies what the Court characterizes as our entitlement to presume that the defendant has been fairly and finally convicted. *Ibid.*

The Court correctly points out, *ante*, at 163, n. 13, that Rule 52(b)[1] was merely a restatement of existing law. The role of the plain-error doctrine has always been to empower courts, especially in criminal cases, to correct errors that seriously affect the "fairness, integrity or public reputation of judicial proceedings." *United States* v. *Atkinson*, 297 U. S. 157, 160 (1936). Significantly, although some of the Rules of Criminal Procedure appear under headings such as "Preliminary Proceedings," "Trial," or "Appeal," Rule 52(b) is one of the "General Provisions" of the Rules, applicable to all stages of all criminal proceedings in federal courts. See Fed. Rule Crim. Proc. 1.

---

[1] Rule 52(b) provides:

"Plain errors or defects affecting sustantial rights may be noticed although they were not brought to the attention of the court."

Although the Rule applies to "plain errors *or* defects affecting substantial rights," one commentator has suggested that the disjunctive form of the Rule is only a means of distinguishing between "errors" ( *e. g.*, exclusion of evidence) and "defects" (*e. g.*, defective pleading), and that in either event plain error applies only to errors affecting substantial rights. 8B J. Moore, Moore's Federal Practice ¶ 52.02 [2] (1981).

The Rule has been relied upon to correct errors that may have seriously prejudiced a possibly innocent defendant, see, *e. g., United States* v. *Mann,* 557 F. 2d 1211, 1215–1216 (CA5 1977), and errors that severely undermine the integrity of the judicial proceeding, see, *e. g., United States* v. *Vaughan,* 443 F. 2d 92, 94–95 (CA2 1971). The plain-error Rule mitigates the harsh impact of the adversarial system, under which the defendant is generally bound by the conduct of his lawyer, by providing relief in exceptional cases despite the lawyer's failure to object at trial. The Rule thus "has a salutary effect on the prosecution's conduct of the trial. If the intelligent prosecutor wishes to guard against the possibility of reversible error, he cannot rely on the incompetence or inexperience of his adversary but, on the contrary, must often intervene to protect the defendant from the mistakes of counsel." 8B J. Moore, Moore's Federal Practice ¶ 52.02 [2] (1981).

The Rule does not undermine our interest in the finality of criminal convictions. Rule 52(b) permits, rather than directs, the courts to notice plain error; the power to recognize plain error is one that the courts are admonished to exercise cautiously, see *United States* v. *Diez,* 515 F. 2d 892, 896 (CA5 1975), and resort to only in "exceptional circumstances," *Atkinson, supra,* at 160. Yet, it is this power that the Court holds Congress intended to deny federal courts reviewing actions brought under § 2255. But the text and history of the Federal Rules of Criminal Procedure, § 2255, and the special Rules governing § 2255 actions make clear that the Court errs.[2]

---

[2] The Court suggests that allowing federal courts to recognize plain error on collateral review would obscure the differences between collateral review and appeal. *Ante,* at 165. But the significant differences between § 2255 and direct appeal remain unaffected by the application of Rule 52(b) to § 2255 actions. Even if an objection is properly preserved, an error which can be raised on appeal is not cognizable under § 2255 unless it is a constitutional violation or an error of law or fact of such "fundamental char-

## B

The Court's assumption that Rule 52(b) is inapplicable to proceedings under § 2255 is built upon dictum in *Henderson* v. *Kibbe*, 431 U. S. 145, 154 (1977), which suggests that the plain-error Rule is inapplicable in a habeas corpus action under 28 U. S. C. § 2254. Even if I were to agree, and I do not, that the plain-error doctrine has no role in § 2254 actions, I could not accept the Court's analysis because it fails to consider the explicit congressional distinction between § 2254,[3] a *civil* collateral review procedure for *state* prisoners, and § 2255,[4] a *criminal* collateral review procedure for *federal* prisoners.

---

acter" that it "renders the entire proceeding irregular and invalid." *United States* v. *Addonizio*, 442 U. S. 178, 186 (1979). See also *Hill* v. *United States*, 368 U. S. 424, 428 (1962).

[3] Title 28 U. S. C. § 2254 provides in pertinent part:

"State custody; remedies in State courts

"(a) The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."

[4] Title 28 U. S. C. § 2255 provides in pertinent part:

"Federal Custody; remedies on motion attacking sentence:

"A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A motion for such relief may be made at any time.

.      .      .      .

"An application for a writ of habeas corpus in behalf of a prisoner who is authorized to apply for relief by motion pursuant to this section, shall not be entertained if it appears that the applicant has failed to apply for relief, by motion, to the court which sentenced him, or that such court has denied him relief, unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention."

In enacting 28 U. S. C. §§ 2254 and 2255, Congress could not have been more explicit: Section 2254 provided for a separate civil action, but a § 2255 motion was "a further step in the criminal case in which petitioner is sentenced." S. Rep. No. 1526, 80th Cong., 2d Sess., 2 (1948).[5] This was reaffirmed in the 28 U. S. C. § 2254 Rules and the 28 U. S. C. § 2255 Rules, approved by Congress in 1976. 90 Stat. 1334. The Advisory Committee's Notes for the § 2255 Rules emphasize repeatedly that a proceeding under § 2255 is a continuation of the criminal trial and not a civil proceeding. Advisory Committee's Notes to § 2255 Rules 1, 3, 11, 12, 28 U. S. C., pp. 280, 282, 287.[6]

Section 2255 Rule 12 directs that "[i]f no procedure is specifically prescribed by these rules, the district court [consid-

---

[5] Section 2255 was intended to be in the nature of, but much broader than, the ancient writ of *coram nobis.* Unlike the writ of habeas corpus provided for state prisoners under § 2254, § 2255 directs the prisoner back to the court that sentenced him. The habeas writ remains available to federal prisoners where the motion provided under § 2255 is for some reason inadequate. S. Rep. No. 1526, 80th Cong., 2d Sess., 2 (1948). See also H. R. Rep. No. 308, 80th Cong., 1st Sess., A180 (1947). See generally *United States* v. *Hayman,* 342 U. S. 205 (1952).

[6] The Advisory Committee's Note to Rule 1 states in pertinent part:

"Whereas sections 2241–2254 (dealing with federal habeas for those in state custody) speak of the district court judge 'issuing the writ' as the operative remedy, section 2255 provides that, if the judge finds the movant's assertions to be meritorious, he 'shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.' This is possible because a motion under § 2255 is a further step in the movant's criminal case and not a separate civil action, as appears from the legislative history of section 2 of S. 20, 80th Congress, the provisions of which were incorporated by the same Congress in title 28 U. S. C. as § 2255." 28 U. S. C., p. 280.

The Note to Rule 3 states that the filing fee required for actions under § 2254 actions is not required for motions under § 2255: "[A]s in other motions filed in a criminal action, there is no requirement of a filing fee." 28 U. S. C., p. 283.

Rule 11 was amended in 1979 to provide that the time for appeal of § 2255 motions is governed by Rule 4(a), the civil provison of the Federal Rules of

ering a motion under § 2255] may proceed in any lawful manner not inconsistent with these rules, or any applicable statute, and *may apply the Federal Rules of Criminal Procedure* or the Federal Rules of Civil Procedure, whichever it deems most appropriate, to motions filed under these rules." (Emphasis added.) This is in contrast to the parallel Rule governing motions under § 2254, which provides: "The Federal Rules of *Civil* Procedure, to the extent that they are not inconsistent with [the Rules governing § 2254 cases], may be applied, when appropriate . . . ." 28 U. S. C. § 2254 Rule 11 (emphasis added). The Court today blurs the distinction between § 2255 and § 2254, ignores Congress' insistence that a § 2255 motion is a continuation of the criminal trial, and makes no mention of Congress' express authorization to apply the Federal Rules of Criminal Procedure.

The Court suggests that to apply the plain-error Rule in § 2255 proceedings and not in § 2254 habeas actions would grant federal prisoners a "preferred" status. *Ante,* at 166. To the contrary, to bar federal judges from recognizing plain errors on collateral review is to bind the federal prisoners more tightly than their state counterparts to this Court's procedural barriers. State-court judges may have power to recognize plain error in collateral review of state-court convictions, see, *e. g., Nelson* v. *State,* 208 So. 2d 506, 509 (Fla. App. 1968); *People* v. *Weathers,* 83 Ill. App. 3d 451, 453, 404 N. E. 2d 1011, 1012 (1980); *Wright* v. *State,* 33 Md. App. 68, 70, 363 A. 2d 520, 522 (1976); *Riggs* v. *State,* 50 Ore. App.

---

Appellate Procedure, rather than Rule 4(b), the criminal provision. But the Note to Rule 11 states: "Even though section 2255 proceedings are a further step in the criminal case, [this provision] correctly states current law." 28 U. S. C., p. 695 (1976 ed., Supp. IV).

The Note to Rule 12 states:

"This rule differs from rule 11 of the § 2254 rules in that it includes the Federal Rules of Criminal Procedure as well as the civil. This is because of the nature of a § 2255 motion as a continuing part of the criminal proceeding (see advisory committee note to rule 1) as well as a remedy analogous to habeas corpus by state prisoners." 28 U. S. C., p. 287.

109, 114, 622 P. 2d 327, 329 (1981); indeed, by waiving a procedural bar, state courts can permit the petitioner collateral review in federal court as well. See *Mullaney* v. *Wilbur*, 421 U. S. 684, 688, n. 7 (1975). But the federal prisoner's only source of respite from this Court's "airtight system of [procedural] forfeitures," *Wainwright* v. *Sykes*, 433 U. S., at 101 (BRENNAN, J., dissenting), lies with the discretionary exercise of the federal courts' power. The Court's ruling does not establish parity between federal and state prisoners; rather it unduly restricts the power of the federal courts to remedy substantial injustice.

As the Court notes, *ante*, at 166, the concerns of comity which underlie many of the opinions establishing obstacles to § 2254 review of state confinement, *e. g.*, *Sumner* v. *Mata*, 449 U. S., at 550; *Stone* v. *Powell*, 428 U. S., at 491, n. 31; *Francis* v. *Henderson*, 425 U. S. 536, 541 (1976), are absent here. If it is true, as the Court has repeatedly asserted, that the tensions inherent in federal-court review of state-court convictions require that substantive rights yield at times to procedural rules, no similar tension exists in a § 2255 proceeding. Under § 2255, the prisoner is directed back to the same court that first convicted him. The plain-error doctrine merely allows federal courts the discretion common to most courts to waive procedural defaults where justice requires.

I might add that this is not the first instance in which the Court has obscured the distinction between § 2254 and § 2255. In *Francis* v. *Henderson*, *supra*, and then in *Wainwright* v. *Sykes*, *supra*, the Court ignored the distinction between § 2255 and § 2254 in order to *apply* a Federal Rule of Criminal Procedure to the purely *civil* § 2254 proceeding. Now, ironically, the Court again obscures the distinction, this time to *avoid* application of a Criminal Procedure Rule to a *criminal* § 2255 proceeding. With each obfuscation of the distinction between § 2254 and § 2255, the Court has erected a new "procedural hurdl[e]," see *Engle* v. *Issac*, *ante*, at 136 (STEVENS, J., concurring in part and dissenting in part), for prisoners seeking collateral review of their convictions. Indeed,

the "cause and prejudice" standard, which the Court today decides pre-empts the plain-error Rule, and which I continue to view as antithetical to this Court's duty to ensure that " 'federal constitutional rights of personal liberty shall not be denied without the fullest opportunity for plenary federal judicial review,' " [7] has its origin in the Federal Rules of Criminal Procedure that the Court now finds inapplicable. As the cause-and-prejudice standard has taken on its talismanic role in the law of habeas corpus only through the Court's past application of the principles of the Federal Rules of Criminal Procedure in both § 2254 and § 2255 actions, perhaps a brief review of this history is in order.

The "cause and prejudice" standard originated in *Davis* v. *United States*, 411 U. S. 233 (1973). In *Davis*, the Court applied Rule 12(b)(2) of the Federal Rules of Criminal Procedure [8] to hold that a federal prisoner seeking collateral review under § 2255 had waived his objection to the composition of the grand jury. Relying on the exception for "cause shown" in Rule 12(b)(2), and *Shotwell Manufacturing Co.* v. *United States*, 371 U. S. 341 (1963) (a case of direct appeal from a federal conviction in which the Court construed the cause exception to Rule 12(b)(2) as encompassing an inquiry into prejudice), the Court divined a rule for § 2255 challenges to the composition of the grand jury: such claims were cognizable only if the prisoner showed both "cause" and "prejudice." *Davis* v. *United States, supra,* at 243–245.

---

[7] *Francis* v. *Henderson*, 425 U. S. 536, 543 (1976) (BRENNAN, J., dissenting), quoting *Fay* v. *Noia*, 372 U. S. 391, 424 (1963).

[8] Rule 12(b)(2), amended in 1974, provided in pertinent part at the time *Davis* was decided:

"Defenses and objections based on defects in the institution of the prosecution or in the indictment or information other than that it fails to show jurisdiction in the court or to charge an offense may be raised only by motion before trial. . . . Failure to present any such defense or objection as herein provided constitutes a waiver thereof, but the court for cause shown may grant relief from the waiver."

On the foundation of *Davis*, the Court has built an incredible "house of cards whose foundation has escaped any systematic inspection." *Wainwright* v. *Sykes, supra*, at 100, n. 1 (BRENNAN, J., dissenting). Notwithstanding the lack of any evidence of congressional purpose to apply the Federal Rules of Criminal Procedure except in § 2255 proceedings,[9] *Francis* v. *Henderson, supra*, applied the *Davis* "cause and prejudice" standard to a *state* prisoner who, in a § 2254 proceeding, raised a constitutional challenge to the composition of the grand jury. 425 U. S., at 541–542; see *id.*, at 548 (BRENNAN, J., dissenting). Building upon this strained foundation, *Wainwright* v. *Sykes* relied on *Davis* and *Francis* to declare the "cause and prejudice" standard applicable to *all* procedural defaults occurring during the trial of a *state* criminal defendant. Finally, coming full circle, the Court today relies on this "cause and prejudice" standard to pre-empt the plain-error standard of Rule 52(b).

*Francis* and *Wainwright* held applicable to a *civil* proceeding an inapplicable Rule of Criminal Procedure in order to defeat substantial claims of state prisoners. Today the Court excludes the applicablity in a criminal proceeding of a Rule of Criminal Procedure plainly intended by Congress to be available to federal prisoners. Any consistency in these decisions lies in their announcement that even in the teeth of clear congressional direction to the contrary, this Court will strain to subordinate a prisoner's interest in substantial justice to a supposed government interest in finality.

---

[9] The Court stated in *Davis*, without citation, that "[t]he Federal Rules of Criminal Procedure do not *ex proprio vigore* govern post-conviction proceedings." 411 U. S., at 241. This statement was plainly wrong! The special § 2255 Rules had not yet been adopted and the Criminal Rules expressly state that they govern all criminal proceedings, see n. 7, *supra.* At any rate, the Court then went on, *ipse dixit*, to find it "inconceivable" that Congress did not intend to have Rule 12(b)(2) govern in the § 2255 action. 411 U. S., at 242.

## II

The Court's determination to ride roughshod over congressional intention in order to curtail the collateral remedies of prisoners, state and federal, is evident in its passing up the opportunity to decide this case on the ground offered by the Government, Brief for United States 41, n. 34, and adopted by JUSTICE BLACKMUN in his opinion concurring in the judgment, that, in any event, petitioner did not show that the instructions constituted plain error affecting his substantial rights. That admittedly is a close question on this record.[10]

The Government argues that because the jury could not have found premeditation without also inferring malice, the unobjected to instructions did not affect "substantial rights." A plausible counter to this argument occurs to me in that the trial court instructed the jury that malice and premeditation were two separate elements of the crime, App. 26–29. The premeditation instruction did not, in terms, require the jury to find that the defendant acted without such provocation as would preclude a finding of malice. Yet, if the Court had concluded that there was not "plain" error, it might be difficult to support a dissent from that conclusion, given the particular facts of this case. As the Court did not base it's holding upon this ground, I dissent.

---

[10] I certainly agree with the Court of Appeals that "[a] clear miscarriage of justice has occurred if [respondent] was guiilty of manslaughter and is now serving the penalty for murder." 204 U. S. App. D. C. 234, 240, 636 F. 2d 506, 512 (1980). But it is by no means clear that there was a basis for finding that such a miscarriage may have occurred in this case.