39 F.3d 1181
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Cecilia Diane GARRETT, Petitioner-Appellant,
v.
Christine MONEY, Warden, Respondent-Appellee.
 No. 94-3053.
 United States Court of Appeals, Sixth Circuit.
 Oct. 28, 1994.
 
 Before: MARTIN, NELSON, and DAUGHTREY, Circuit Judges.
 PER CURIAM.
 
 
 1
 This appeal arises from the filing of a petition for a writ of habeas corpus, pursuant to 28 U.S.C. Sec. 2254, by an Ohio state prisoner, Cecilia Diane Garrett, who was convicted of rape and gross sexual imposition involving a four-year-old child. In her petition, Garrett argues forcefully that under the factual circumstances of her case, the state trial court violated her constitutional right to due process by invoking Ohio's "rape shield statute" to exclude certain crucial evidence at trial. The evidence in question consisted of testimony that the child, when first examined for sex abuse, was found to be infected with a venereal disease, trichomoniasis. Apparently, the petitioner hoped to prove that she herself was not infected with trichomoniasis, from which fact the jury could somehow infer that she was not involved in the abuse of the child.
 
 
 2
 The district court, in a detailed and carefully reasoned opinion, denied relief. In affirming the judgment, we rely, in relevant part, on the district judge's analysis and his resulting decision to deny issuance of the writ.
 
 
 3
 There are several obvious flaws in the petitioner's argument that she is the victim of a constitutionally impermissible application of Ohio's rape shield statute. The first, and most obvious, is that the state trial judge excluded the evidence in question on the basis of its lack of relevancy, and not pursuant to Ohio's rape shield statute, Ohio Rev.Code Ann. Sec. 2907.02. After a careful review of the record now before us, we conclude that the trial judge was correct in his determination that the evidence was irrelevant. Because the relevancy of the evidence was not established, it follows that it was not "crucial" to Garrett's defense and that its exclusion did not constitute a due process violation.
 
 
 4
 Second, when the evidence was initially excluded, at the state's request, the petitioner failed to make a proffer sufficient to preserve the question on appeal, let alone on collateral review. Moreover, when mention of the disputed evidence was made at a later point in the trial, the petitioner failed to object or to make a request for either a cautionary instruction or a mistrial.
 
 
 5
 Third, the constitutional issue raised here was not raised at trial in the state court or on direct appeal. In such a circumstance, the burden is on the petitioner to establish "cause and prejudice" for her failure to litigate the constitutional claim in state court. United States v. Frady, 456 U.S. 152, 167 (1982). There is, however, no proof of cause in this record and, we conclude, an insufficient demonstration of prejudice. Reviewing the record de novo, we find no basis upon which to disturb the district court's determination that habeas corpus relief is not appropriate in this case.
 
 
 6
 The facts in the underlying criminal case in state court were somewhat unusual. They are summarized in the opinion of the Ohio Court of Appeals, on direct appeal from the trial court, as follows:
 
 
 7
 [On September 23, 1988], the four-year-old victim was window shopping with her mother at Eastgate Mall when the victim told her mother she had been touched by their neighbors, Ron Starrett [petitioner's co-defendant] and appellant. The victim was a frequent visitor to appellant's Mt. Carmel apartment where she would play with appellant's two daughters. According to her mother, the victim said the Starrett had "put his deedle in her mouth and white pee stuff comed out and she choked." Moreover, the mother said the victim told her that appellant [Garrett] had "put her mouth on [the victim's] private and had made [the victim] do that to her."
 
 
 8
 Shocked and desperate for assistance, the mother immediately took her daughter to the closest doctor's office. There, they consulted with Dr. Gregory Ebner, who referred them to Children's Hospital Medical Center in Cincinnati.
 
 
 9
 At the hospital, social worker Judy Wood interviewed the victim. According to Wood, the victim used anatomically-correct dolls to describe what had occurred, essentially repeating what she had told her mother.
 
 
 10
 Dr. John Jamison then examined the victim for signs of abuse. This went smoothly until Jamison attempted a pelvic examination. At that moment, the victim panicked and the victim's mother requested that the pelvic examination be attempted at a later date. However, the doctor's brief examination of the victim's exterior genitalia revealed two suspicious abrasions.
 
 
 11
 Another attempt at examining the victim was similarly frustrated. Finally, in November 1988, with the victim under sedation, a pelvic examination was conducted. Dr. Cynthia Briede testified that this examination revealed signs of vaginal trauma: the victim's hymeneal ring had been ruptured and scarred, and a diffuse redness was apparent in the area. Briede testified that these findings were consistent with the victim's vagina having been penetrated by a cylindrical object, such as a penis.
 
 
 12
 Medical examination further revealed that the child had been burned with a cigarette inside her mouth, bitten on the back of her neck, and stuck or scratched with a ball-point pen. There was ample reason to conclude that she had been sexually penetrated both orally and vaginally.
 
 
 13
 Garrett and her boyfriend, Ronald Starrett, were jointly charged under existing Ohio statutes with one count of rape with a specification, a second count of felonious sexual assault, and a third count of gross sexual imposition with a specification. The two co-defendants moved for a severance, and when it was denied, they went to trial together. At the close of the state's case-in-chief, however, co-defendant Starrett pleaded guilty on one count to the lesser included offense of attempted rape and on another count to gross sexual imposition, leaving petitioner Garrett to face the jury alone.
 
 
 14
 Before his client changed his plea from not guilty to guilty, Starrett's lawyer asked the victim's mother on cross-examination if it was true that the four-year-old had been infected with "a disease called trichomoniasis," but did not refer to it as being a "sexually transmitted disease." The state prosecutor quickly objected and the jury was excused. The following discussion ensued:
 
 
 15
 THE COURT: What was the question, Mr. Ferenc?
 
 
 16
 MR. FERENC [counsel for petitioner's co-defendant]: The question was, Your Honor, if on the 23rd of September, 1988, during the initial exam, it was found that Shannon was infected with what is currently classified as a sexually transmitted disease known as trichomoniasis.
 
 
 17
 That was part of the exam that Dr. Jamison provided. It's been on the reports, all the medical records that have been provided to us. I'm just trying to find out what they found during this exam. It's no different than an abrasion they've noted during the other exam.
 
 
 18
 MR. BREYER: Judge, in response to that, the fact that we provide items in discovery does not mean that these items are then admissible in Court, number one. This evidence of VD can have either one of two possibilities, Judge. It can indicate that the girl was the victim of sexual abuse and that then shows that she was either abused by someone else which would show evidence of prior sexual conduct on her behalf or by way of the defendants.
 
 
 19
 The Rape Shield Statute points out prior sexual conduct, and I would say lack of sexual conduct, by either the defendants or the victim. And to use this evidence in that regard, you should comply with the Rape Shield Statute which requires a hearing three days prior to trial. We've now made opening statements, we have a witness on the stand and I don't believe it's appropriate at this point to get into this evidence.
 
 
 20
 THE COURT: Would you step out also?
 
 
 21
 THE WITNESS: Yes.
 
 
 22
 (Whereupon, the witness left the courtroom.)
 
 THE COURT: Are we talking VD?[1]
 
 23
 MR. FERENC: Yes.
 
 
 24
 MR. BREYER: Yes, Judge. If I could explain the facts here, this girl was examined. She was found to have trichomoniasis or whatever the correct pronunciation is, which the doctor would indicate, if he were asked, and the issue came up, that can only be gained through sexual conduct. Of course it is obvious evidence that someone has abused this particular girl.
 
 
 25
 This occurred in September when this was discovered. The doctor also indicates that this is a disease which is easily eradicated and, in fact, a male carrier can get the disease out of his system within several weeks without even treatment. The defendant was examined, at least one of them, two months later, or greater. And I believe that he was found to be negative at that time.
 
 
 26
 However, that is not relevant in this particular case. It would be relevant that she had a sexually transmitted disease. That would show that she has been abused. We've chosen at this point to keep it out. Whether or not the defendant ever had it or at least didn't have it two months later, is of no relevance whatsoever. It has only a prejudicial effect on the jury. Because there is no logical connection between someone not having a disease several months later, that the victim had two months prior to that, when it's a disease which can be gotten rid of without even medical treatment.
 
 
 27
 MR. FERENC: Judge, if I may state the facts. Trichomoniasis, and this is based on medical testimony that we can present, and that we've talked to, trichomoniasis does not spontaneously resolve itself. If they have a doctor that said that it can go away then so be it, because I'm prepared to present a physician who would say that it doesn't spontaneously resolve itself.
 
 
 28
 What is happening here though, Judge, is we're getting off on the mechanics of this particular disease and whether it's relevant that he had it two months later or not. The fact of the matter is, Judge, that it's pertinent in this case and it's relevant to this case because, number one, the child was found with this particular disease. Number two, she was treated for that particular disease. Number three, there is medical testimony to show that she was okay after a certain length of time.
 
 
 29
 And we're prepared to present evidence, Judge, that may contradict this situation. And what they are saying is that we're not permitted to ask about the medical findings that a doctor made. If they want to draw inferences on what that means and what that does not mean, that is argument. But in terms of relevancy, did this child have a disease? Did her mother treat her? Did her mother understand the necessary treatment, Your Honor, I think is very critical to our case.
 
 
 30
 The trial court ruled that testimony concerning the child's infection was irrelevant and prejudicial, and sustained the state's objection. Subsequently, outside the jury's presence, the prosecutor sought to exclude any further testimony concerning the existence or non-existence of trichomoniasis as it related to the victim and the two defendants:
 
 
 31
 MR. BREYER [Prosecutor]: Judge, by the way of proceeding, we would like to bring back to the Court's attention our previously made motion in limine to prevent the defendant from bringing out through cross-examination or direct testimony any evidence whatsoever of the existence of trichomoniasis a sexually transmitted disease in or on the person of Shannon Sadeik, who was the victim in this case. As Your Honor is aware we would belive [sic] it's inappropriate to bring that out, not only barred by the rape shield statute, but barred by Rule 403. I believe, I'm not sure regarding relevant evidence only, relevant evidence may be presented and evidence which the prejudicial effect outweighs the relevance surely would be excluded, and that exclusion is mandatory. And that's the gist of our motion.
 
 
 32
 THE COURT: Mr. Staley.
 
 
 33
 MR. STALEY [counsel for petitioner]: Thank you, Your Honor, I would argue that we should be allowed to inquire in this and bring this out in the open during cross-examination of this pending witness and other witnesses. Your Honor, my reasons are three, if I may. First reason is that it is my opinion that the rape shield statute that the prosecutor is talking about barring this evidence is not applicable to one count of the indictment and therefore has no effect at all. It only exists to bar on the rape count and the gross sexual imposition count. But, does not bar any evidence concerning the second count of the indictment.
 
 
 34
 THE COURT: Which is what?
 
 
 35
 MR. STALEY: Felonious sexual penetration, which is 2907.12, and I agree the rape shield statute does not apply there.
 
 
 36
 THE COURT: How does it become relevant?
 
 
 37
 MR. STALEY: It becomes relevant because it goes to some of the issues in this case as to consent and also--
 
 
 38
 THE COURT: Consent, what are you talking about?
 
 
 39
 MR. STALEY: Your Honor, I think the evidence will show that the little girl had a disease, and it can be sexually transmitted.
 
 
 40
 THE COURT: I understand that, what count are we talking about?
 
 
 41
 MR. BREYER: Felonious sexual penetration.
 
 
 42
 THE COURT: What does that have to do with the disease, Mr. Staley?
 
 
 43
 MR. STALEY: This particular disease can be sexually transmitted.
 
 
 44
 THE COURT: So what.
 
 
 45
 MR. STALEY: The little girl was reinfected at some later date, and it's our contention that the perpetrator is someone in her own household as opposed to the defendant.
 
 
 46
 THE COURT: What does it have to do with any count that we are dealing with regard to this defendant? Surely it can't be count two. I don't care whether she has a disease or not, it's irrelevant as to that. Your motion is overruled. Your motion is granted. It's a motion in limine, no, it doesn't pertain to one, three or whatever else it is.
 
 
 47
 MR. STALEY: I believe it does, Your Honor. I will cite the case of State of Ohio versus Williams, which is 21 Ohio State 3d 33. Where the Ohio State Supreme Court indicated that evidence admissible despite the rape shield law can be introduced. In that particular case the evidence was, I believe it was going to the issue of consent in a rape case and the allegations by the defense was that the victim was a prostitute. She denied ever consenting to have sex and they were trying to not only impeach her but also go to one issue in the charge against the defendant, and the Supreme Court of Ohio said that was entirely permissible despite the rape shield law. And I think we are confronted with the same situation here. I think it will be a miscarriage of justice if we don't find out where that particular disease came from. It was truly a sexually transmitted disease from ... the perpetrator of the particular crime and our clients were found free of that particular disease.
 
 
 48
 THE COURT: Which count are you talking about? I don't want to spend a lot of time on this.
 
 
 49
 MR. STALEY: One and three, rape and gross sexual imposition.
 
 
 50
 THE COURT [to the prosecutor]: Your motion [in limine] is granted.
 
 
 51
 Later in the trial, the prosecutor unintentionally elicited a non-responsive answer from Dr. Amy Hill, a physician who had examined the victim, as follows:
 
 
 52
 Q.: And to the best of your recollection again we're talking about something that happened back in September. What was that history that the mom gave you?
 
 
 53
 A.: Well, the mother told me that her daughter had been seen several days prior to that and had been diagnosed with a sexually transmitted disease and was being worked up for sexual abuse. And I had a copy of that exam that was done previously with me and it did document that she had been examined for a sexually transmitted disease. But, we didn't get into that any further.
 
 
 54
 Dr. Hill's response marked the only time that the term "sexually transmitted disease" was associated with the term "trichomoniasis" in front of the jury. Significantly, there was no objection to this testimony, nor did defense counsel ask the district court to give the jury a cautionary instruction or to declare a mistrial. Furthermore, as the district court found in its opinion:
 
 
 55
 Petitioner's counsel made no proffer of the evidence she would have offered about trichomoniasis. Although there was oblique reference to potential evidence regarding the disease during the arguments to the trial judge, neither the identity of the proposed witnesses nor the particulars of their testimony were set out. Apparently one of the two defendants was tested for trichomoniasis more than two months after September 23, 1988. Neither the testing protocol nor the relevance of the testing results were proffered. Defendants asserted the victim was "re-infected." No time frame was specified. No proffer was made of laboratory test results or medical testimony.
 
 
 56
 Hence, we are faced in this case with a lack of proffer to support introduction of the disputed evidence at trial, the absence of a contemporaneous objection when it was actually broached, and the failure to challenge the trial court's decision to exclude the evidence on constitutional grounds in state court. These are significant legal hurdles that the petitioner would have to overcome in order to prevail under Sec. 2254. We might have found error had the trial judge invoked the rape shield statute to "shield" a four-year-old child from embarrassment in testifying about other sexual contacts she might have had, as not in keeping with the purpose and policy of such a statute. But, the trial court's ruling was clearly based on relevancy grounds and not some faulty application of Ohio Rev.Code Ann. Sec. 2907.02. Moreover, it is difficult to hold the state judge in error for failing to act in response to Dr. Hill's isolated testimony identifying trichomoniasis as a "sexually transmitted diseases" without more, when no one--on either side of the lawsuit--objected in any fashion to her statement.
 
 
 57
 We agree with the district court's determination that the disputed evidence was excludable on relevancy grounds. From what little information is included in the record, it appears that trichomoniasis is a relatively innocuous form of venereal disease that can be cured by a single seven-day treatment. Hence, the fact that the victim was infected with trichomoniasis on a certain date, but co-defendant Starrett (the only person identified in the record from whom the child could have contracted the disease) was not infected two months later is, simply, immaterial. It fails to establish that Starrett was not infected two months earlier, since he might have been treated and cured in the meantime. Moreover, even if Starrett could prove that he had never had trichomoniasis, this fact would not necessarily establish that he did not sexually abuse the victim. At most, it would tend to prove that someone else had also abused her. As for the petitioner in this case, Cecilia Garrett, information about her status as a carrier of trichomoniasis would have had even less probative value, since there is no plausible set of facts in the record under which the infection could have been transmitted directly from the petitioner to the victim.[2] Indeed, Garrett could have been altogether free of infection at the time Starrett sexually abused the child if Starrett himself had contracted the disease from a third party and had transmitted it to the victim but had not transmitted it to Garrett. Finally, there is some indication in the record that trichomoniasis can be contracted from sources other than by sexual transmission, such as a contaminated toilet seat or a wet towel.[3] Obviously, further litigation of this issue would have entangled the trial court in a dispute over a largely--if not wholly--collateral matter.
 
 
 58
 In considering a petition for a writ of habeas corpus filed by a state prisoner, the federal courts must defer to a state court's interpretation of its own rules of evidence and procedure. Allen v. Morris, 845 F.2d 610, 614 (6th Cir.1988), cert. denied, 488 U.S. 1011 (1989). Moreover, "[i]t is a well-established rule that state court rulings on the admission or exclusion of evidence' ... may not be questioned in a federal habeas corpus proceeding, unless they render the trial so fundamentally unfair as to constitute a denial of federal rights.' " Logan v. Marshall, 680 F.2d 1121, 1123 (6th Cir.1982) (quoting Gillihan v. Rodriquez, 551 F.2d 1182, 1193 (10th Cir.1977)). In this case, the district court found no denial of the petitioner's federal rights as a result of the state trial court's discretionary ruling on the admissibility of evidence concerning the victim's infection with trichomoniasis. After careful study, we conclude that there is no basis on which to disturb the district court's judgment.
 
 
 59
 For all the reasons set out above, we conclude that the petitioner has failed to establish that she suffered a constitutional deprivation in connection with her trial and conviction in state court. We therefore AFFIRM the judgment of the district court denying habeas corpus relief.
 
 
 
 [1]
 As the district court noted in its opinion, "[t]richomoniasis is a sexually transmitted disease. It affects about 20% of women during their reproductive years. It is not syphilitic. It causes vaginitis, urethritis, and cystitis ... Patients who take Metronidazole 250 mg. orally t.i.d. after meals for seven days as an initial treatment have a 95% cure rate. Trichomoniasis is a flagellate protozoan found in the GU tract which causes vaginitis, urethritis, and cystitis. It is difficult to detect in males. Most infected males are asymptomatic carriers who are infectious to their sexual partners. Merck, Manual (14th ed. 1982) pp. 1624-1625."
 
 
 [2]
 Trichomoniasis is not orally sited, and the only mode of sexual transmission is through actual genital contact. See Gerald L. Mandell et al., Principles and Practice of Infectious Diseases 2116 (3rd ed. 1990): "The organism's natural habitat is the human vagina, urethra, and associated structures such as bladder, Bartholin's and Skene's gland, prostate, epidiclymis, cervix, and, in rare cases, the foreskin."
 
 
 [3]
 According to Lawrence S. Neinstein et al., writing in Nonsexual Transmission of Sexually Transmitted Diseases: An Infrequent Occurrence, 74 Pediatrics 67, 72 (1984): "Careful studies have shown that trichomoniasis can survive on toilet seats for up to one hour, and on wet clothes for at least three hours...."