**UNITED STATES of America, Plaintiff,**

**v.**

**David Lynn JOHNSON, Defendant.**

**No. 92–40015–01–RDR.**

United States District Court,
D. Kansas.

Sept. 17, 1997.

David Lynn Johnson, Leavenworth, KS, pro se.

Gregory G. Hough, Office of U.S. Attorney, Topeka, KS, for U.S.

## MEMORANDUM AND ORDER

ROGERS, Senior District Judge.

This matter is presently before the court upon the petitioner's motion to vacate, set aside or correct sentence pursuant to 28 U.S.C. § 2255.[1] Having carefully reviewed the arguments of the parties, the court is now prepared to rule.

The defendant was convicted by a jury on September 22, 1992 of one count of conspiracy to distribute or possess with intent to distribute phenyl–2–propanone (P2P) and two counts of knowingly distributing or possessing with intent to distribute P2P. His convictions were affirmed on appeal. *United States v. Johnson,* 12 F.3d 1540 (10th Cir. 1993), *cert. denied,* ––– U.S. –––, 116 S.Ct. 139, 133 L.Ed.2d 86 (1995). The facts underlying his convictions were set forth in the appellate opinion as follows:

> In February 1992, Rayburn Clark, a confidential informant for the Kansas Bureau of Investigation (KBI), told KBI Agent Randall Listrom that the Johnsons had the necessary chemicals to manufacture methamphetamine and were seeking glassware to be used in the manufacturing process.
>
> On March 4, 1992, David Johnson told Clark that rather than obtain the glassware and complete the manufacturing process, he wanted to sell three gallons of "meth oil" (apparently, P2P), and then leave town. On instructions from the KBI, Clark set up a meeting that night between David Johnson and KBI undercover agent Jim Lane, who posed as a potential buyer.

At this meeting, Johnson provided Lane with a 140–gram "sample" of P2P. The following day, David Johnson was arrested for an unrelated parole violation. From jail he arranged by telephone for Robert Johnson and "Rick" (presumably, Niedfeldt) to complete the transaction. Robert met Clark that afternoon and proposed that Clark and Lane meet Robert and Rick and follow them into the countryside. The KBI advised Clark to reject this plan as it appeared too dangerous. David Johnson thereafter instead arranged, again by telephone from jail, to complete the transaction upon his release from jail on March 9.

On that day, Richard Niedfeldt picked up David from jail and drove him, in Niedfeldt's car, to Topeka. They met Lane and Clark in a motel room. After Lane produced $35,000 in cash, David sent Niedfeldt out to the car to retrieve the P2P. David sold Lane three jugs of the chemical, later determined to weigh a total of 11.3 kilograms, for $34,000. As David and Niedfeldt left the room, they were arrested. Niedfeldt, who was carrying the cash in a paper bag, attempted to escape but was tackled by a KBI agent.

12 F.3d at 1543.

In the instant motion, the defendant contends that his Fifth Amendment rights were violated when the prosecutor commented on his post-*Miranda* silence. He acknowledges that this issue was not raised or appeal, but he contends that it was not raised due to ineffective assistance of counsel. The defendant also contends in this motion that the court erred by sentencing him to a term of supervised release in excess of that allowed by law.

An evidentiary hearing must be held on a § 2255 motion "unless the motion and files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255; *United States v. Galloway,* 56 F.3d 1239, 1240 n. 1 (10th Cir.1995). The court believes that the materials already in

---

1. The instant motion was filed on April 9, 1997 and is therefore timely under the recently enacted provisions of 28 U.S.C. § 2255. *United States v. Simmonds,* 111 F.3d 737, 746 (10th Cir.1997)

("[P]risoners whose convictions became final on or before April 24, 1996 must file their § 2255 motions before April 27, 1997.").

the record conclusively show that no hearing is necessary in this case. The defendant has requested that the court appoint counsel to assist him in presenting this motion to the court. The court finds that such an appointment is unnecessary. The defendant has adequately presented the court with the factual background and legal basis for his arguments.

A § 2255 proceeding may not be used to challenge the legality of matters which should have been raised on direct appeal. *United States v. Frady,* 456 U.S. 152, 165, 102 S.Ct. 1584, 1593, 71 L.Ed.2d 816 (1982); *United States v. Allen,* 16 F.3d 377, 378 (10th Cir.1994) To overcome this procedural bar, the defendant must show cause for his failure to present the claim on direct appeal and prejudice resulting therefrom, or that a fundamental defect occurred which inherently resulted in a complete miscarriage of justice. *Coleman v. Thompson,* 501 U.S. 722, 750, 111 S.Ct. 2546, 2564–65, 115 L.Ed.2d 640 (1991); *United States v. Cook,* 997 F.2d 1312, 1320 (10th Cir.1993).

The court must initially determine if the defendant has established cause for his failures to raise the issue of the government's comment on his post-*Miranda* silence on direct appeal. A defendant may establish cause for his procedural default by showing he received ineffective assistance of counsel. *United States v. Cook,* 45 F.3d 388, 392 (10th Cir.1995). "When a defendant alleges his appellate counsel rendered ineffective assistance by failing to raise an issue on appeal, we examine the merits of the omitted issue.... If the omitted issue is without merit, counsel's failure to raise it 'does not constitute constitutionally ineffective assistance of counsel.'" *Id.* at 392–93 (quoting *United States v. Dixon,* 1 F.3d 1080, 1084 n. 5 (10th Cir.1993)).

To establish a claim for ineffective assistance of counsel, a defendant must show that (1) his counsel's performance was constitutionally deficient, and (2) counsel's deficient performance was prejudicial. *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). Counsel's performance is deficient if the representation "falls below an objective standard of reason-

ableness." *Id.* at 690, 104 S.Ct. at 2065–66. Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. Here, the defendant's ineffective assistance of counsel claim turns on, and is inextricably linked with, the validity of the defendant's claim concerning the government's comment on his post-*Miranda* silence. Accordingly, we now consider that issue.

The defendant contends that the government improperly presented evidence and commented to the jury on his constitutional right to remain silent. The defendant relied upon the defense of coercion during the trial. The defendant contended that Rayburn Clark, also known as "Rebel," had threatened him and forced him to sell the P2P to the undercover KBI agent. The defendant argues that the government improperly suggested to the jury he was guilty because he failed to provide the exculpatory evidence he offered at trial after he was arrested and given his *Miranda* warning.

The record reveals the following on the issue of the defendant's silence following his arrest and his receipt of the *Miranda* warning. Defendant counsel first broached the subject of defendant's silence during her opening statement with the following comments:

> We ask you, as you listen to the evidence, to imagine yourself in David Johnson's shoes and to try to feel the pervasive fear that he felt because Rebel threatened to kill him and harm his family. Threats that he did not escape, even by going to jail. This fear so consumed David that he did not even tell the officers of the threats after he was arrested. Rebel told him before that he would get to him even in jail. At that point, it was obvious that Rebel was working with the police. And who was David to think they would believe, him or their own informant. The evidence will show that Rayburn Clark, Rebel, is someone who is to be feared.

The government then addressed the issue of the defendant's silence with its first witness, Detective Randall Listrom of the Topeka Police Department. During direct exami-

nation of Det. Listrom, the following colloquy occurred:

Q. After their arrest, did you have occasion to speak with David Johnson?

A. Yes I did.

Q. And would you describe for the jury what, if anything, was discussed?

A. When he was walking in the room, I introduced myself to him. He told me he hadn't seen me in years. I obtained some personal information from him, confirmed that he was on parole to Joe Atherton, the State Parole Office. I asked him for his address. He advised me he didn't have a current address. I asked him where he was staying at before he was arrested on the parole violation and he advised me 1220 North Van Buren, which was his sister's house. I advised him of his rights and told him that he was in quite a bit of trouble, that he was on parole, he was two or three time loser, and that now might be the time that he might want to talk with us. He asked what I was getting at and I told him that, first off, that we were in this business to get ahead and try to exchange some information. And he asked—his statements was, "What do I get when you get ahead?" And then we explained to him we wouldn't make any promises as to what might happen in exchanging information, but that wasn't up to us. I told him, as well, that we were concerned about the chemicals that we alleged he was warehousing. His reply was, "I don't know that I'm warehousing any chemicals or glassware at this point in time. There's things scattered around the country, or there used to be but, huh, you know, some points in time someone starts some shit."

Q. Okay. Then after those comments—strike that.

During his conversation with you, did he ever give you any indication whatsoever that he had not voluntarily entered into the transaction that night in the motel room?

A. No, sir. There was never that indication.

As the direct examination of Det. Listrom continued, government counsel elicited the following additional testimony:

Q. During your conversation with Mr. Johnson and Mr. Niedfeldt, did they appear comfortable with you?

A. Yes.

Q. At any point, did they indicate or did they mention the name Rayburn Clark?

A. No.

Q. Did they talk about Rebel at all?

A. No.

The issue was next discussed curing the testimony of another government witness, Kansas Bureau of Investigation Special Agent Lynn Currier Myers. This time the issue was raised by defense counsel and from a different perspective than she had suggested during her opening statement. The following occurred during the cross-examination of Agent Myers:

Q. When you were talking with Mr. Johnson, he told you about the threats from Rebel, didn't he?

A. I do not have that information.

Q. You mean, it's not in your report?

A. I do not remember that information.

Q. This has been back in March, is that right?

A. That's correct.

Q. And you have reviewed your report to refresh your memory, is that right?

A. That's correct.

Q. The fact that that information is not in your report doesn't mean that it didn't happen?

A. As I stated earlier, I do not recall that information being supplied to me by Mr. Johnson.

The following colloquy on the matter then occurred during redirect examination of Agent Myers:

Q. Okay. Now, you were asked by Ms. Trubey about the videotaped statement of David Johnson. And you were asked about threats that had been made against him. Do you recall that line of questioning?

A. From Ms. Trubey?

Q. From Ms. Trubey.

A. That's correct. I did.

Q. And you indicated that you had no knowledge of that ever being told to you?

A. That's correct.

Q. Were you in the interview room with David Johnson during the entire conversation?

A. To the best of my recollection, I was.

Q. And was the entire thing videotaped?

A. That, I do not recall. It was under the control of the police department and it's a hidden video camera, if you will, and I don't have any control when it was on or off. I did my job on the interview and he requested counsel, so the interview stopped.

Q. Okay. Now, someone raising the issue of something such as threats, is that the type of a thing that you would report if it did happen?

A. Yes, sir.

Q. And based on your training and experience, it would then appear in the written reports that are before you?

A. That's correct.

Q. And is there any indication in those written reports that David Johnson indicated that anyone had threatened him?

A. In my records, the basic information was that when he was advised of his *Miranda* warning, he invoked his rights, and the questioning stopped except for the basics of his name, his address and date of birth information.

Q. Okay. So, then there is no mention in your report of any threats?

A. That's correct.

Defense counsel continued to present evidence that the defendant had indeed informed police officers of the threats and coercion by Clark after his arrest during the presentation of his case. The defendant called Jacqueline Reid–Peterson, an attorney who was called by the defendant to the Topeka Police Department on the night of his arrest for legal consultation. The following occurred during the direct examination of Ms. Reid–Peterson:

Q. And who did you meet with at the Topeka Police station?

A. When I got there, I met with Randy Listrom, initially.

Q. All right. And then did you later meet with David Johnson?

A. Yes, I did.

Q. Did you and David have a conversation?

A. Yes, we did.

Q. Could you describe that for the jury, please?

A. One of the first things I said to David was that I would not be able to represent him. This was based upon some things that Randy Listrom had said to me, mainly that, he was talking about federal charges. And I explained to David that I did not practice criminal law in federal court, that I would not—I had explained this to Randy Listrom, as well, I would not be able to represent him in any matters that were related to federal court.

Q. All right. Did David then tell you anything about why he became involved in this activity?

A. He did. We didn't talk, Actually, much at all about any of the details.

A. Yes, he did. He indicated—well, he told me that he had somehow gotten involved with a person, he named him as Rebel, and that this man had threatened him. And he mentioned several things to me, that he had told him what he would do to him if he did not comply and follow through with the drug transaction.

Q. And what did David tell you that Rebel had indicated he would do to David?

A. Some of the things that I remember involved, I believe it was breaking his legs or knee caps or both, that stuck in my mind. He talked about weapons. I remember that it was on more than one occasion that he talked to this Rebel, or that these threats had been made. I remember him talking about weapons and I remember a gun and a knife. I remember that David was very afraid for, particularly, his sister. His sister—he mentioned both his sister and his father, but he kept telling me, "I don't know what he would do to my sister, Kris, if I didn't do this." And

he was concerned about her as well as himself.

Q. Now, you said that David told you these things. Do you know if these statements were made in the presence of any officers?

A. Initially, they were made to me alone. And then, I'm just almost absolutely positive that he reiterated the fear and the concern when Agent Myer (sic) and Tony Hazen were in the room. I'm not sure if Randy Listrom was in there at that time. He was in and out. He really never sat down. If he did, it was just like leaning against the table. But he was in and out, so I don't know about Detective Listrom.

Government counsel revisited the issue during examination when the following discussion occurred:

Q. And it was on March the 9th in the room with Agent Hazen and Agent Myers, that your testimony is that David Johnson indicated that Mr. Clark had threatened him, is that correct?

A. He said it to me personally and he said it again, as well, to them. I'm not sure if he mentioned the name. I know he didn't use the name Clark. I don't know that name.

Q. He said Rebel?

A. Rebel, Rebel.

The government called Det. Listrom and Agent Myers in rebuttal. During Det. Listrom's testimony, the following occurred:

Q. Do you recall your prior testimony about the statement that Mr. Johnson gave you after his arrest?

A. Yes, I do.

Q. Okay. During those conversations, at any time, did he indicate that he had been threatened into doing this conspiracy?

A. No.

Q. At any point during that conversation, did he deny his involvement in the conspiracy?

A. No.

Q. Was this also true of the conversation that you had with him and Ms. Peterson?

A. Yes.

Q. How many statements have you taken in similar drug conspiracy type matters, sir?

A. Probably five hundred to a thousand or more.

Q. And have you ever had an occasion where an individual claimed that they had been set up in a deal?

A. Yes.

Q. And have you ever had an occasion where an individual claimed that they had been duped into a deal and had no knowledge of it?

A. Yes.

Q. And based on your training and experience, when are those types of comments made?

A. Those statements typically come in in the first part of the interview process where we're interviewing them.

Q. And are they generally adamantly made?

A. Yes.

Q. Did any of that occur in your conversation with David Johnson on March the 9th?

A. No.

During Agent Myers' testimony, the following occurred:

Q. Agent Myers, you have previously testified that you were present during a conversation after the arrest of David Johnson on March the 9th?

A. That's correct.

Q. And you were present with David Johnson and his attorney, Jackie Peterson?

A. That's correct.

Q. During that conversation, at any time, did David Johnson or Ms. Peterson indicate that David Johnson, in any way, had been threatened?

A. No, not that I can recall.

Q. Any indication at all that he had been set up?

A. No.

Q. Any indication whatsoever that he was not voluntarily involved in this conspiracy?

A. No.

Defense counsel followed up on this issue during cross-examination of Agent Myers:

Q. Mr. Myers, on March the 9th when you were present with David Johnson and Ms. Peterson, you were taking notes, were you not, sir?

A. Yes, ma'am.

Q. Do you have those notes with you?

A. No, I do not.

Q. Where are they?

A. The only notes were accurately reflected onto my report, because Mr. Johnson reflected that he needed counsel. And that everything that was written down would be in exchange for information that never—that he never supplied.

Q. Now, you took those notes simultaneously. with the conversation, is that right?

A. Yes, I did.

Q. And that conversation took place approximately six months ago?

A. That's correct.

Q. Now, you're not saying that statements were not made about David Johnson being threatened, you're saying that you don't recall, is that correct, do I understand you?

A. I do not recall any statements that he was threatened or intimidated.

During the initial portion of his closing argument, government counsel made the following comments:

And at that point, they were arrested. They then gave statements. David Johnson, in his statement, and Richard Niedfeldt, in his statement, to the agents, at no point in time, ever indicated that anybody had ever made any threats. Nobody indicated to anybody that they had been set up. Never denied their guilt. And, in fact, expressed full knowledge of this conspiracy. Ladies and gentlemen, if somebody has been set up, the first word out of their mouth when they're in a situation to say so is, "This is bologna. I was set up.

You guys have no case. This is ridiculous." It's something that would have come out of there immediately ladies and gentlemen, and it never did. And why didn't it? Because they were in it from the beginning, the three of them.

Defense counsel addressed the issue of the defendant's statements to the police in her closing argument as follows:

Ms. Peterson told you that on the night of March 9th, after David was arrested, she went down to the jail. And at that time, even though David—she wasn't going to be able to represent David, David told her about the threats. And Ms. Peterson said she recalled the threats involved legs and guns and knives. Ms. Peterson told you that she's 99 percent sure that David made those same, statements in the presence of Tony Hazen and Currier Myers. Well, now, Mr. Myers comes in here and claims not to have made any notes about what was said, and claims not to remember. Ms. Peterson said she didn't think that the threats would make any difference, and they didn't.

Government counsel then had the following comments during the concluding portion of his closing argument:

She indicates that David Johnson told her that he was threatened but it's ironic Detective Listrom and Currier Myers never once heard anything about that. Think about Ms. Peterson not being certain that the conversation even took place. And think about David Johnson never ever communicating to anyone that it happened, other than her.

Never, at any point in time during his statement, that David Johnson made to law enforcement, he was given the same opportunity Richard Niedfeldt was given. At no point in time did he ever make any of the claims you heard from the witness stand. No mention of threats, no denial of guilt, never indicated, "Well, I was set up. I was framed."

Richard Niedfeldt and David Johnson came equipped with their stories, the stories that they told you that they achieved, for the very first time. The stories never told to anyone until now. That's just part of the conspiracy, secretive by nature.

The first mention of defendant's statements or absence of statements to the police following his arrest was made by defense counsel in her opening statement. She indicated that the defendant did not make a statement to police after he was arrested about the coercion he was subjected to by Rayburn Clark because of his fear of Clark. This position, however, changed during the course of the trial. Defense counsel subsequently sought to show that the defendant had indeed told the police following his arrest about the threats and coercion from Clark. Defense counsel questioned an officer who was there during the interrogation of the defendant and asked if the defendant ever mentioned it. She attempted to leave the impression with the jury that the defendant had made such a statement and the offer had either forgotten it or discounted it. During the defendants's case, defense counsel called an attorney who went to the police station the night of the defendant's arrest and met with the defendants and the officers interviewing him. She affirmatively stated that the defendant did indeed inform the officers of the threats and coercion by Clark.

In *Doyle v. Ohio*, 426 U.S. 610, 619, 96 S.Ct. 2240, 2245, 49 L.Ed.2d 91 (1976), the Supreme Court held that "the use for impeachment purposes of [a defendant's] silence, at the time of arrest and after receiving *Miranda* warnings, violate[s] the Due Proceeds Clause." The Court reasoned:

The warnings mandated by [*Miranda*], as a prophylactic means of safeguarding Fifth Amendment rights, ... require that a person taken into custody be advised immediately that he has the right to remain silent, that anything he says may be used against him, and that he has a right to retained or appointed counsel before submitting to interrogation. Silence in the wake of these warnings may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest

silence is insolubly ambiguous because of what the State is required to advise the person arrested.... Moreover, while it is true that the *Miranda* warnings contain no express assurance that silence will carry no penalty, such assurance is implicit to any person who receives the warnings. In such circumstances, it would be fundamentally unfair and a deprivation of due process to allow the arrested person's silence to be used to impeach an explanation subsequently offered at trial.

426 U.S. at 617–18, 96 S.Ct. at 2244–45 (citations and footnote omitted).

■■■ Having reviewed the record in this case, the court is convinced that the government did not violate the defendant's constitutional rights by commenting on his post-*Miranda* silence for several reasons. First, the government's introduction of evidence on the defendant's failure to mention the threats and coercion following his arrest came after the comments of defense counsel during opening statement. In the opening statement, defense counsel apparently had two objectives in referring to defendant's silence after arrest. First, she sought to explain why the defendant had not mentioned the threats and coercion following his arrest. Second, she sought to bolster his coercion defense. In this regard, she suggested that the defendant's fear had reached such a level that he was unable to even articulate it to the police. These comments in opening statement opened the door and invited the later testimony offered by the government through Det. Listrom. Where the defendant raises a defense during opening statement, the issue is inarguably in dispute, and the government may take the defendant at his word and introduce evidence in its case-in-chief on that point. *See United States v. Kerr*, 981 F.2d 1050, 1052 (9th Cir.1992); *United States v. Segal*, 852 F.2d 1152, 1155 (9th Cir.1988); *United States v. Estabrook*, 774 F.2d 284, 289 (8th Cir.1985). The government is allowed to comment on post-*Miranda* silence where the defendant raises the issue in the first instance. *See United States v. Pino*, 827 F.2d 1429, 1432 (10th Cir.1987) (government's questions about defendant's post-arrest silence were invited where defen-

dant initiated the inquiry on his silence); *see also United States ex rel. Saulsbury v. Greer,* 702 F.2d 651, 655–56 (7th Cir.) (prosecution permitted to question defendant on post-*Miranda* silence where inquiry about silence initiated on· defendant's direct examination), *cert. denied,* 461 U.S. 935, 103 S.Ct. 2104, 77 L.Ed.2d 310 (1983).

 Moreover, the subsequent conduct of defense counsel in offering evidence that the defendant did make statements to the officers after his arrest about the coercion allowed the additional evidence offered by the government and the subsequent comments made by the government during closing argument. .At this point, the government's evidence and statements were not a comment on the defendant's silence. Rather, they were a response to the defendant's contention that he told the officers that he had been coerced into the transaction to sell P2P by Clark. The government had both the opportunity and the obligation to introduce evidence about whether such statements were made. The government was further permitted to comment on the truthfulness of such statements and their impact on the defense offered by the defendant. In *Doyle,* the Supreme Court recognized that these circumstances did not constitute an improper. comment on the defendant's right to remain silent. The Court explained:

> It goes without saying that the fact of post-arrest silence could be used by the
> · prosecution to contradict a defendant who testifies to an exculpatory version of events and claims to have told the police, the same version upon arrest. In that situation the fact of earlier silence would not be used to impeach the exculpatory story, but rather to challenge the defendant's testimony as to his behavior following arrest.

426 U.S. at 619–20 n. 11, 96 S.Ct. at 2245 n. 11 (citation omitted) *See also United States v. Conlin,* 551 F.2d 534, 537 (2d Cir.) (where defense counsel claimed defendant made exculpatory statements at time of arrest, prosecution could rebut defense version of events), *cert. denied,* 434 U.S. 831, 98 S.Ct. 114, 54 L.Ed.2d 91 (1977); *United States v. Fairchild,* 505 F.2d 1378, 1383 (5th Cir.1975) (de-

fendant's testimony that he had cooperated with the police opened the door to prosecutor's questioning police regarding defendant's post-arrest silence). In sum, the court discerns no constitutional violation here.

Given the lack of merit on this issue, the court finds that counsel's failure to raise it on appeal does not constitute ineffective assistance of counsel. Accordingly, absent a showing of cause for failure to raise these issues on direct appeal, the defendant . is barred from raising them in this § 2255 motion.

 The court next turns to the defendant's argument concerning his sentence. He contends that the court improperly sentenced him to a term of six years of supervised release. He argues that the court incorrectly enhanced his sentence without the filing of an information as required by 21 U.S.C. § 851. The government responds that the sentence was appropriate because an information setting forth the defendant's prior convictions was filed.

 The court notes that the issue argued by the defendant was not raised at the time of sentencing or on appeal. Procedural default should not apply where a defendant was sentenced in excess of the maximum authorized by law. *See United States v. Wilson,* 997 F.2d 429, 431 (8th Cir.1993). If the court finds that the defendant's argument has merit, we will proceed to provide relief "to avoid manifest injustice." *Id.*

Having carefully reviewed the records and arguments of the parties, the court is persuaded that the .defendant has discovered an error by the court in sentencing. The defendant is correct that the court erred in sentencing the defendant to a term of supervised release of six years.

The defendant correctly points out that the enhancement provisions of 21 U.S.C. § 841(b)(1)(C) were not applicable here because the government did not file an information as required by 21 U.S.C. § 851. The government points to an information that was filed concerning co-defendant Robert Johnson. The court questions the government's diligence in examining the appropriate document. The court expects counsel to

at least view a document before representing to the court what it states.

As pointed out by the defendant, the appropriate guideline range for defendant's term of supervised release is three to five years. U.S.S.G. § 5D1.2(a). The court can sentence the defendant beyond the maximum period of supervised release of three years for Class C felons as set forth in 18 U.S.C. § 3583(b)(2). *United States v. Orozco–Rodriguez,* 60 F.3d 705, 707–08 (10th Cir.1995) ("except as otherwise provided" language of 18 U.S.C. § 3583(b) permits longer period of supervised release allowed for, but not required by, U.S.S.G. § 5D1.2(a)).

The defendant requests that a sentencing hearing be scheduled to impose a new term of supervised release. The defendant also contends that the court can address his entire sentence based upon this error. The court shall schedule a sentencing hearing to determine the appropriate term of supervised release. The court shall not, however, consider the remainder of the defendant's sentence. There is no basis to adjust the remainder of the defendant's sentence. For the purpose of the resentencing, the court shall appoint Marilyn Trubey, assistant Federal Public Defender, to represent the defendant as he requested in the instant motion.

**IT IS THEREFORE ORDERED** that defendant's motion to vacate, set aside or correct sentence (Doc. # # 377 and 387) be hereby granted in part and denied in part as set forth in the aforementioned opinion. A hearing to resentence the defendant on his term of supervised release shall be conducted on October 17, 1997 at 9:30 a.m. The court hereby appoints Ms. Marilyn Trubey to represent the defendant at that hearing. The Clerk is directed to send a copy of this memorandum and order to Ms. Trubey as well as to the other parties of the case.

**IT IS SO ORDERED.**