**United States Court of Appeals**

**FOR THE EIGHTH CIRCUIT**

_____

No. 96-3749

_____

United States of America,          *
                                   *
          Plaintiff - Appellee,    *
                                   * Appeal from the United States
     v.                            * District Court for the Southern
                                   * District of Iowa.
David Dean Millard; Julia Lynn     *
Millard,                           *
                                   *
          Defendants-              *
Appellants.

_____

Submitted:  April 14, 1997
                    Filed:  March 30, 1998

_____

Before LOKEN, JOHN R. GIBSON, AND MAGILL, Circuit Judges.

_____

JOHN R. GIBSON, Circuit Judge.

David Millard and Julia Millard, husband and wife, were found guilty of conspiracy to distribute methamphetamine, in violation of 21 U.S.C. § 846 (1994), and were sentenced to life imprisonment under 21 U.S.C. § 841(b)(1)(A) (1994).[1]  The Millards appeal, arguing their convictions are based on improperly admitted evidence.

---

[1]David Millard was also found guilty on two counts of the use of a communication facility to distribute methamphetamine, in violation of 21 U.S.C. § 843(b) (1994), and was sentenced to two ninety-six month sentences to run concurrently with his life sentence.

The Millards also contend the district court erred in sentencing. We reverse Julia Millard's conviction and remand for a new trial. We affirm David Millard's conviction and sentencing.

In January 1995, Urbandale, Iowa police officers discovered that Chad Bowans and Tim Krueger were involved in methamphetamine transactions. Krueger would "front" methamphetamine to Bowans, and then Bowans would pay either Krueger or Krueger's cousin, Raymond "Buddy" Krejci, for the methamphetamine at a later date. Bowans agreed to cooperate with the police. On January 12, Bowans paid Krejci $1,800, which was $10,450 less than the total amount due. Krejci then delivered the $1,800 to David Millard. On January 24, Krueger collected the remaining $10,450 from Bowans. The police then confronted Krueger, and he also agreed to cooperate. Both Bowans and Krueger participated in obtaining recorded conversations.

On February 2, 1995, Agent Mark Hein gave Krueger $10,450 in marked bills, which Krueger delivered to David Millard. Later that day, police officers searched the Millards' home and David Millard's truck. The officers recovered the $10,450 in marked bills in the home and some broken triple beam scales in the attic. However, they did not locate any methamphetamine or methamphetamine residue in either the Millards' house or David's truck.

After the search, Agent Hein told the Millards that if they were arrested and found guilty of methamphetamine distribution they would receive automatic life sentences because of their earlier felony drug convictions. Hein told the Millards they would likely receive lesser sentences if they cooperated. The Millards, primarily David, thereafter cooperated and led the government to others involved in distributing methamphetamine. However, neither David nor Julia entered into a plea agreement, and the government eventually prosecuted them.

-2-

# I.

The Millards argue that their convictions should be reversed because they are based on inadmissable evidence.  Specifically, they contend the district court erred in admitting evidence of their prior felony drug convictions, in admitting statements made during plea discussions, and in admitting evidence of prior drug activity outside the scope of the conspiracy.  None of this evidence was objected to at trial.

Ordinarily, we review a district court's evidentiary rulings for abuse of discretion.  However, where there is no objection, we review the admission of  evidence for plain error under Federal Rule of Criminal Procedure 52(b).[2]  United States v. Swanson, 9 F.3d 1354, 1356 (8th Cir. 1993).  In Swanson, we stated that where there is no contemporaneous objection an error "will be grounds for reversal only if the error prejudices the substantial rights of the defendant and would result in a miscarriage of justice if left uncorrected."  Id. at 1357 (quoting United States v. Carey, 898 F.2d 642, 644 (8th Cir. 1990)).

Since Swanson, the Supreme Court articulated a more expansive approach to the  plain error doctrine in United States v. Olano, 507 U.S. 725 (1993).  The Court in Olano stated that for a court to correct a forfeited error under Rule 52(b):

> [t]here must be an 'error' that is 'plain' and that 'affect[s] substantial rights.'  Moreover, Rule 52(b) leaves the decision to correct the forfeited error within the sound discretion of the court of appeals, and the court should not exercise that discretion unless the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'"  Id. at 732

---

[2]Rule 52(b) states, "Plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

(citing United States v. Young, 470 U.S. 1, 15 (1985) (quoting United States v. Atkinson, 297 U.S. 157, 160 (1936))).

Olano makes clear that first there must indeed be an error, and second "that the error be 'plain.' 'Plain' is synonymous with 'clear' or, equivalently, 'obvious.'" Id. at 734 (citing Young, 470 U.S. at 17, n.14). Olano continued:

> The third and final limitation on appellate authority under Rule 52(b) is that the plain error "affec[t] substantial rights." This is the same language employed in Rule 52(a), and in most cases it means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings.

Id.

Olano emphasized that the defendant bears the burden of persuasion with respect to prejudice and, in most cases, this court cannot correct the forfeited error unless the defendant shows that the error was prejudicial.[3] Id. Again, Young is cited for the proposition that the plain error doctrine requires an appellate court "to find that the claimed error . . . had [a] prejudicial impact on the jury's deliberations." Id.

Olano went on to state that "[i]f the forfeited error is 'plain' and 'affect[s] substantial rights,' the court of appeals has the authority to order correction, but is not required to do so." Id. at 735. "[T]he discretion conferred by Rule 52(b) should be

---

[3]The Court in Olano stated that "[t]here may be a special category of forfeited errors that can be corrected regardless of their effect on the outcome, but this issue need not be addressed. Nor need we address those errors that should be presumed prejudicial if the defendant cannot make a specific showing of prejudice. Normally, although perhaps not in every case, the defendant must make a specific showing of prejudice to satisfy the 'affecting substantial rights' prong of Rule 52(b)." Id. at 735.

employed 'in those circumstances in which a miscarriage of justice would otherwise result.'" Id. at 736 (quoting Young, 470 U.S. at 15 (quoting United States v. Frady, 456 U.S. 152, 163, n. 14 (1982))). The Court concluded that a court of appeals "should correct a plain forfeited error affecting substantial rights if the error 'seriously affect[s] the fairness, integrity or public reputation of judicial proceedings.'" Id. at 736 (quoting Atkinson, 297 U.S. at 160). Olano cautions that the Court has "never held that a Rule 52(b) remedy is only warranted in cases of actual innocence." Id.

## A.

The Millards first argue that the district court erred in admitting into evidence two prior felony drug convictions of David Millard and two prior felony convictions of Julia Millard.

The government introduced evidence of  David Millard's 1980 guilty plea to sponsoring a gathering with the knowledge that a controlled substance would be distributed at the gathering; David Millard's 1990 guilty plea to the delivery of a controlled substance; Julia Millard's 1980 guilty plea to the delivery of a controlled substance; and Julia Millard's 1990 guilty plea to the delivery of a controlled substance. The Millards argue that no basis existed for admitting the prior convictions, and, further, admission of the convictions was extremely prejudicial because the prior convictions were for crimes very similar in nature to the methamphetamine charges.

The government responds that, despite the potential prejudice, the introduction of the prior convictions was not error because the Millards "invited the error" by referring to their prior drug felonies in their opening statements.  Under the "invited error doctrine," if a proponent introduces inadmissable evidence, a court may permit the opponent to rebut the evidence by introducing similarly inadmissable evidence.  See Ryan v. Board of Police Comm'rs, 96 F.3d 1076, 1082 (8th Cir. 1996).  A court may

-5-

apply the doctrine "to neutralize or cure any prejudice incurred from the introduction of the evidence."  Id.

Our study of the opening statements of all parties causes us to conclude that the invited error doctrine does not apply.  In the government's opening statement, the Assistant District Attorney stated:

> Continuing on with the investigation, the Millards were then confronted that evening and asked whether or not they would like to cooperate with the government in pursuing the investigation, and you'll hear testimony that, in fact, the investigation did proceed and, in fact, Mr. Millard agreed or named his source as a Douglas Jackson . . .

> . . . Also in evidence would be the fact that both David and Julia Millard have twice, not once, but twice been convicted of drug felony charges.

Although the Millards' attorneys discussed the Millards' prior convictions in their opening arguments, they did so only after the government had already mentioned the prior convictions in its opening statement.  The Millards may have believed they had no choice but to comment on or explain away the prior convictions mentioned by the government.  In any event, the Millards did not "invite the error," as the government was the first party to discuss the inadmissable prior convictions.

Furthermore, after examining the entire record, we find no permissible basis for the introduction of the Millards' prior convictions.  The convictions were not an element in the offense charged and were thus irrelevant to the issues on trial.  In addition, at the time the government admitted the convictions, neither David nor Julia had testified.  Therefore, Federal Rule of Evidence 609(a)(1), which allows the government to introduce evidence of prior convictions to impeach a defendant's testimony, is not a possible ground for admission of the prior convictions.

In addition, the prior drug convictions are not relevant to any of the admissible purposes allowed under Federal Rule of Evidence 404(b). Rule 404(b) provides that evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity with his character. It may, however, be admissible for other purposes, such as demonstrating proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. See Fed. R. Evid. 404(b). The Millards' prior convictions appear to be relevant only to prove the Millards had the propensity to distribute drugs and are of criminal character -- a use specifically prohibited by Rule 404(b). See United States v. Garbett, 867 F.2d 1132, 1135 (8th Cir. 1989); United States v. Mejia-Uribe, 75 F.3d 395, 398 (8th Cir.), cert. denied, 117 S.Ct. 151 (1996); Fed. R. Evid. 404(b). The district court erred in admitting the Millards' prior convictions.

**B.**

The Millards also contend that the district court erred in admitting statements the Millards made in the course of plea discussions.

Evidence of statements made in the course of plea discussions with an attorney for the government is not admissible against the defendant who participated in the plea discussions. Fed. R. Crim. P. 11(e)(6)(D). Rule 11, by preventing the admission of plea discussions, promotes active plea negotiations and encourages candid plea discussions between the parties. See Rachlin v. United States, 723 F.2d 1373, 1376 (8th Cir. 1983).

Here, Agent Hein[4] testified regarding the plea discussions between himself, the Millards, and Assistant United States Attorney Lester Paff. Hein first testified about discussions that occurred shortly after authorities had searched the Millards' residence. Hein told David that if they were convicted of methamphetamine distribution, they would both receive automatic life sentences because they each had two prior felony convictions. Hein told David that the government would offer him a deal if he would cooperate. Hein testified:

> So I said to Dave that what we would be willing to offer himself a life charge, and we would give Julia a state charge, which meant that Julia wouldn't take a life charge and that I was concerned about who was going to be with the children, if down the line they were to be arrested for dealing methamphetamine and they both got convicted, they were automatically going to get a life charge. What we were trying to offer them was a way to not have to do that, and he responded to me on that.
>
> Q.    Did he respond to that?
>
> A.    Yes, he did.
>
> Q.    And what did he tell you?

---

[4]Although Fed. R. Crim. P. 11(e)(6)(D) refers to statements between the defendant and an "attorney" for the government, we conclude the discussions between the Millards and Agent Hein, although not a government attorney, fall under Rule 11(e)(6). Agent Hein represented to the Millards that he was working directly with Assistant United States Attorney Lester Paff. Hein testified, "I told him [David] that I was interested in his cooperation and that I had talked to Lester Paff prior to coming out here and that if he was interested in cooperating with the government, that we would offer him a particular deal." Furthermore, during the course of these conversations, Hein telephoned Paff and discussed with Paff what deal they could offer the Millards. See United States v. Grant, 622 F.2d 308, 313 (8th Cir. 1980).

A.    He told me, "Give me the state charge.  She can take the life charge."

Next, Hein addressed Julia, and told her the government was interested in her cooperation in exchange for a lesser sentence.  Julia and David then spoke to each other.  Hein testified about this conversation:

> She said, "What do you think?"  And he didn't say a whole lot, and he said he didn't want to take a life charge is what he said, but he was interested in cooperating, but he wasn't going to take a life charge, and he wanted to know what was the best that the government would offer him, and I said "I have no idea.  I'm going to have to talk to the Assistant United States Attorney."

The plea discussions continued with David the next day.  Hein also testified about these discussions explaining that David continued to cooperate with authorities:

> The very next thing that he did was he came into our office and met with us, and we discussed the cooperation, and Mr. Paff was there for this particular discussion.  We talked about what we were willing to offer him and showed him what the guideline ranges would be, what a conspiracy count would come out to based on a lot of different factors.  One of the factors was the amount of methamphetamine that he had sold, and I believe that we came to a 20-year figure, which could be cooperated down from that point, and that Julia would still take a state charge, which means, state charge is probably, my best guess would be around ten years, but she may only have to serve about half of that.

Q.  And did, then, Mr. Millard agree to make some phone calls for you?

A.  Yes, he did.

Hein's testimony then discussed the assistance David provided the ongoing investigation. Hein testified that David Millard eventually stopped cooperating. In all, Hein's testimony concerning the plea discussions and David's cooperation spanned twelve pages of trial transcript.

Courts have long recognized that plea bargaining is essential to the functioning of the criminal justice system. See Santobello v. New York, 404 U.S. 257, 260 (1971); United States v. Penta, 898 F.2d 815, 816-17 (1st Cir. 1990); United States v. Brooks, 536 F.2d 1137, 1139 (6th Cir. 1976). We agree with the Fifth Circuit that:

> If, as the Supreme Court said in Santobello, plea bargaining is an essential component of justice and, properly administered, is to be encouraged, it is immediately apparent that no defendant or his counsel will pursue such an effort if the remarks uttered during the course of it are to be admitted in evidence as proof of guilt. Moreover, it is inherently unfair for the government to engage in such activity, only to use it as a weapon against the defendant when negotiations fail.

United States v. Ross, 493 F.2d 771, 775 (5th Cir. 1974).

Once negotiations failed, the government used the plea discussions against the Millards. Rule 11(e)(6) specifically forbids this.

Similar to the prior conviction evidence, the government argues the introduction of the plea discussions was not error because Julia Millard's counsel "invited the error" by discussing the plea discussions in his opening statement. Again, the invited error doctrine does not apply. The Assistant United States Attorney stated in his opening statement that David Millard, upon being asked by authorities if the Millards would like to cooperate, named his source as Douglas Jackson. Any response by Julia Millard's

-10-

counsel was prompted by the prosecution's initial statement. Her counsel did not "invite the error." The district court erred in admitting this evidence.

## C.

Finally, the Millards argue that the district court erred in admitting evidence of drug trafficking activity outside the scope of the alleged conspiracy. After reviewing the record, we find this argument without merit.

## D.

Thus, we have concluded the district court erred in admitting evidence of the Millards' prior convictions and evidence of the plea bargaining discussions.

As discussed above, the second limitation on appellate authority under Rule 52(b) is that the error be plain or, equivalently, clear or obvious. See Olano, 507 U.S. at 734. Our discussions above make clear that the evidentiary errors are clear under current law.

We now must address the third limitation--whether the plain forfeited error affected substantial rights. See id. As stated earlier, this "means that the error must have been prejudicial: It must have affected the outcome of the district court proceeding." Id.

The evidence of the Millards' prior convictions may have caused the jury to infer that because the Millards were involved in drug trafficking in the past, they were involved in drug trafficking on this occasion. In addition, the improperly admitted plea discussions could have caused the jury to infer that the Millards were guilty, as

-11-

innocent parties probably do not immediately discuss a plea and then cooperate with authorities.  Also, David's request to Agent Hein that he receive the state charge rather than Julia likely caused the jury to look unfavorably upon David.  In addition, the statement may have caused the jury to infer that both David and Julia were guilty since David was willing to subject himself and Julia to imprisonment.

To determine if the improperly admitted evidence affected the Millards' substantial rights, we must examine the entire record and consider the evidentiary errors in conjunction with the other evidence presented against the Millards.  See Young, 470 U.S. at 16; United States v. Guy, 456 F.2d 1157, 1164 (8th Cir. 1972); Mejia-Uribe, 75 F.3d at 399.

With respect to David Millard, Craig Simmons and Tim Krueger both testified that they obtained methamphetamine directly from David Millard.  Similarly, Doug Jackson testified that he delivered quantities of methamphetamine directly to David Millard.  The testimony of these witnesses, as well as that of Chad Bowans, is substantial evidence of David Millard's direct participation in methamphetamine distribution.  Under these circumstances, we cannot conclude the errors affected David Millard's substantial rights--that they affected the outcome of the district court proceedings.  With David, our analysis stops at this point.  The plain error in admitting the evidence is not a basis for reversing his conviction.

However, the evidence of Julia's direct participation is far less than the evidence of David's participation. There is no physical evidence linking Julia to methamphetamine distribution. The government discovered no methamphetamine when searching the Millards' home.  The only pieces of physical evidence tying the Millards to methamphetamine distribution were the broken scales found in the attic.  Tim Krueger testified that he had given these scales to David to weigh methamphetamine.

Krueger also testified that David told him that Alan Millard, his son, had broken the scales because he was upset that David was dealing methamphetamine.

In addition, nearly all of the witness testimony directly implicated David, but not Julia, in distributing methamphetamine. Chad Bowans paid Buddy Krejci $1,800 for methamphetamine. Bowans testified that later that day he received a call from David Millard, whom he had never dealt with before, regarding the amount of the payment. Bowans had never met David or Julia Millard.

Buddy Krejci testified that he delivered the $1,800 he collected from Bowans to David Millard in the Millards' basement. David counted the money and became upset. The two then went upstairs, where Julia was present, and David and Julia talked about how to contact Bowans to find out where the rest of the money was located. Buddy testified that Officer Hein and two other law enforcement officers discussed with Buddy the importance of tying Julia into the conspiracy.

Tim Krueger testified that he first started receiving methamphetamine from the Millards in 1994. When questioned about a specific transaction, Krueger testified that David handed him the methamphetamine at the Millards' house and that Julia witnessed the transaction. Krueger testified that he never received methamphetamine from Julia, but that he did pay Julia three or four times over the entire period he dealt with the Millards. When asked if he talked with Julia about what the money was for, he said, "She knew what I owed and what I owed it for." Krueger testified that she knew this because she would see David give him the methamphetamine. Krueger testified about a recorded conversation at the Millards' home in which he and Julia discussed David's telephone call to Chad Bowans concerning the underpayment. David, who was sleeping at the time, woke up and the three further discussed the call. At one point,

-13-

Julia interrupted David to correct him.  Krueger's testimony in all other respects centered on his methamphetamine dealings with David.

Krueger testified that he started dealing methamphetamine because "Dave asked me to help him get rid of some for him . . . and he knew I could get rid of a bunch quick."  At that point, David asked Krueger to go to the basement and showed him approximately one pound of methamphetamine.  Krueger testified that he sold the methamphetamine primarily to Chad Bowans.  He stated that Bowans and David would often disagree on the correct weight of the methamphetamine.  To clear up any discrepancies in weight, he borrowed Bowans's measuring scales and gave the scales to David because "he needed something to weigh it up on."  In a taped conversation between Bowans and Krueger before Krueger was apprehended, Krueger repeatedly referred to David Millard when discussing methamphetamine, but never referred to Julia. At one point he stated, "With Dave, it's all about making money and staying out of prison."  Krueger testified that he and David would exchange drugs and money in the basement of the house, where Julia normally was not present.  Furthermore,  Krueger testified that he delivered the $10,450 in marked bills to David.  In cooperating with officials, Krueger, like Buddy, was instructed to try to gather information tying both David and Julia into the drug conspiracy.

Craig Simmons testified that he began receiving methamphetamine from the Millards in 1994.  He was asked, "Were there times when you would receive methamphetamine from Julia Millard?"; and "[W]ould there be times that you would give money to Julia Millard?"; and "[W]as it clear to you that they were both working together and selling methamphetamine?"  He answered yes.  Thereafter, like Krueger, Simmons discussed his methamphetamine dealings as occurring with David.

-14-

Simmons testified about a recorded phone call in which he and David discussed Simmons providing David with an ounce of methamphetamine. Simmons testified that he subsequently delivered the methamphetamine to David. After the transaction, Doug Jackson informed Simmons that David had been arrested and that David owed Jackson money for drugs. Simmons further testified that he saw David cut up a pound of methamphetamine to put in baggies for distribution. He also stated that Doug Jackson distributed a couple of pounds of methamphetamine to David every seven to ten days.

Doug Jackson testified that he supplied David with methamphetamine, that David was a regular customer, and that David would pay him for the methamphetamine. Jackson testified that he never dealt directly with Julia.

Finally, Agent Mark Hein was present at the Millards' home when agents discovered the $10,450 in marked bills. Hein testified that Julia showed him where the money was, but that she told him David had given her the money.

As demonstrated above, the evidence against Julia Millard was substantially weaker than the evidence against David. Julia's direct participation in methamphetamine distribution is supported only by "yes" answers Craig Simmons gave in response to leading questions. The remainder of Simmons's testimony dealt exclusively with David Millard. Tim Krueger testified that he never obtained methamphetamine from Julia, but that he did deliver money to her three or four times. Her knowledge of what the money was for and Julia's observations of David distributing methamphetamine were the extent of Krueger's direct evidence against Julia Millard. Krueger described his conversation with Julia concerning David's telephone conversation with Chad Bowans. However, the evidence was clear that David called Bowans from a pay phone, where Julia was not present. Most evidently,

Julia's discussion of the phone call came from what she was told, presumably by David. Furthermore, Krueger stated that most of the time Julia was not in the basement when David and Krueger exchanged money and drugs.

Certainly, the evidence demonstrated that Julia had knowledge of David's drug activity, but the evidence as to her actual participation was quite limited. While her conviction was of conspiracy to distribute methamphetamine, rather than substantive acts, the issue is the relationship between the evidence admitted through plain error and the evidence as a whole. Considering the evidence described above, we conclude the plain error in admitting the earlier convictions and the guilty plea conversations affected the outcome of Julia Millard's trial.

Under Olano, having determined that the forfeited errors are plain and affect Julia's substantial rights, we have the power to reverse, but are not required to do so. See Olano, 507 U.S. at 736. We should exercise that discretion in those circumstances in which a miscarriage of justice would otherwise result. Id. The inquiry revolves around whether the error "seriously affect[s] the fairness, integrity or public reputation of judicial proceedings. Id. The improperly admitted convictions and plea discussions were telling and damaging evidence pointing to Julia Millard's guilt and should not have been considered for this purpose. In this case, with Julia's conviction leading to a life sentence, we conclude the plain errors seriously affected the fairness and integrity of her trial. We therefore reverse Julia Millard's conviction and remand for a new trial.

**II.**

Next, the Millards contend the district court erred in sentencing. Because we have reversed Julia Millard's conviction, we address only David Millard's sentencing arguments.

-16-

21 U.S.C. § 841(b)(1)(A) provides that "[i]f any person commits a violation of this subparagraph . . . after two or more prior convictions for a felony drug offense have become final, such person shall be sentenced to a mandatory term of life imprisonment without release . . . ."  The district court concluded that David Millard had two prior drug felony convictions and accordingly sentenced David Millard to life imprisonment.

David argues that, under United States v. Pazzanese, 982 F.2d 251 (8th Cir. 1992), his 1980 conviction is not a prior felony drug offense.  On April 22, 1980, David pled guilty in Iowa District Court to sponsoring a gathering with the knowledge that a controlled substance would be distributed, used, or possessed at the gathering.  In Pazzanese, the district court imposed a mandatory minimum sentence because the defendant had a prior felony conviction for criminal facilitation.  On appeal, we held that the criminal facilitation charge was not a felony drug offense because the New York criminal facilitation charge was not limited to the regulation of drugs and required no specific intent to commit a drug crime.  See Pazzanese, 982 F.2d at 253-54.  David argues that the Iowa statute he was convicted under did not require the government to prove that he had the mental culpability to commit the underlying substantive offense of distribution of a controlled substance.

The Iowa statute under which David was convicted states:

It is unlawful for any person to sponsor, promote, or aid, or assist in the sponsoring or promoting of a meeting, gathering or assemblage with the knowledge or intent that a controlled substance be there distributed, used or possessed, in violation of this chapter.

Iowa Code § 204.407 (1979).

-17-

Thus, David pled guilty to sponsoring a gathering with the knowledge or intent that a controlled substance would be distributed. The statute specifically requires that the act is committed with knowledge or intent. Because the Iowa statute contains an element of mental culpability directly related to a drug crime, we hold that this conviction is a prior felony under 21 U.S.C. § 841(b)(1)(A). See United States v. Henderson-Durand, 985 F.2d 970, 975 n.8 (8th Cir. 1993). In addition, section 204.407 specifically regulates activities involving controlled substances, further distinguishing this statute from the statute in Pazzanese, which did not specifically prohibit or restrict drug activity. See Pazzanese, 982 F.2d at 254.

Next, David argues that both convictions were the result of one ongoing conspiracy. Therefore, his 1990 conviction for delivery of cocaine should merge with the present charge, forming a single criminal episode, and his 1990 conviction should not constitute a separate prior felony drug offense. If two convictions result from acts forming a single criminal episode, they should be treated as a single conviction for sentencing enhancement under section 841(b)(1)(A). See United States v. Rice, 43 F.3d 601, 605-06 (11th Cir. 1995).

David bases his argument on the fact that Doug Jackson was his source of cocaine leading to his 1990 conviction and his source of methamphetamine leading to his current conviction. David further argues that the people involved in the 1990 cocaine distribution network were the same people involved in the methamphetamine conspiracy.

There is no merit in David's argument. David's cocaine conviction occurred in 1990. David's current conviction was based on acts occurring from December 1992 through March 1, 1995. In addition, David served prison time in between the 1990 conviction and the conduct leading up to the current conviction. Furthermore, the

convictions involved the distribution of different substances, cocaine and methamphetamine.  The district court did not err in finding that the 1990 conviction was a separate criminal episode from the methamphetamine conviction.

### III.

Finally, the Millards argue that they received ineffective assistance of counsel.  Once again, because Julia Millard's conviction has been reversed, we address only David Millard's argument.  Generally, an ineffective assistance of counsel claim is "not cognizable on direct appeal." United States v. Jennings, 12 F.3d 836, 840 (8th Cir. 1994).  Instead, such a claim is properly raised in a 28 U.S.C. § 2255 action.  See id.  An exception to this rule has been recognized where the district court has developed a record on the issue.  See id.  Because the district court did not develop a record as to  ineffective assistance of counsel, we do not address this claim.

For the reasons stated above, we affirm David Millard's conviction and the sentence imposed, and we reverse Julia Millard's conviction and remand for a new trial.

A true copy.

Attest:

CLERK, U. S. COURT OF APPEALS, EIGHTH CIRCUIT.